UNITED STATES, Appellee,

v.

Andrew L. ARRUZA, Captain, U.S. Army, Appellant.

No. 54284.
CM 445358.

United States Court of Military Appeals.

July 18, 1988.

For appellant: *Major Marion E. Winter* (argued), *Homer A. Walkup* (on brief), *Captain Carolyn F. Washington.*

For appellee: *Captain Thomas L. Herrington* (argued), *Colonel Norman G. Cooper, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Larry D. Williams, Captain Tarek Sawi* (on brief), *Major Robert L. Swann.*

*Opinion*

COX, Judge:

Chaplain (Captain) Andrew L. Arruza was tried by general court-martial composed of officer members at Mainz-Gonsenheim, Federal Republic of Germany. He was charged with raping and sodomizing a female under 16 years of age, in violation

of Articles 120 and 125, Uniform Code of Military Justice, 10 U.S.C §§ 920 and 925, respectively. Contrary to his pleas, he was found guilty of two specifications of the lesser-included offense of taking indecent liberties with a female under the age of 16, in violation of Article 134, UCMJ, 10 U.S.C. § 934. He was sentenced to confinement for 5 years, dismissal from the service, and forfeiture of $2,000 pay per month for 60 months. The convening authority approved the sentence, and the Court of Military Review affirmed the findings and sentence. 21 M.J. 621 (1985).

This Court granted review of an issue raised by appellate defense counsel and specified a second. The granted issue questions:

WHETHER THE MILITARY JUDGE ERRED IN ADMITTING, OVER DEFENSE OBJECTION, AS PROSECUTION EVIDENCE IN CHIEF, TESTIMONY RENDERED AT A PRETRIAL INVESTIGATION BY A SIX-YEAR-OLD CHILD TO THE EFFECT THAT SHE HAD BEEN SEXUALLY MOLESTED BY APPELLANT.

At the time of the offenses, the victim was 6 years old. Her mother, an Army Sergeant, had been seeing appellant socially. The child testified under oath against appellant at the Article 32, UCMJ, 10 U.S.C. § 832, investigation, and the Government produced her as a witness at the court-martial. However, through a combination of trial manuevers and apparent[1] intimidation, civilian defense counsel succeeded in silencing the victim at the court-martial. The result was that she became unavailable as a witness, and the military judge granted the Government's motion to admit the victim's Article 32 testimony.[2]

Appellant reasserts here, as he did at trial, that the Article 32 examination was conducted solely for the purpose of discovery and, thus, lacked a "similar motive" as required for admissibility under Mil.R. Evid. 804(b)(1), Manual for Courts-Martial, United States, 1969 (Revised edition). That rule states:

*Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) *Former testimony.* Testimony given as a witness at another hearing of the same or different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. A record of testimony given before courts-martial, courts of inquiry, military commissions, other military tribunals, and before proceedings pursuant to or equivalent to those required by Article 32 is admissible under this subdivision if such a record is a verbatim record. This paragraph is subject to the limitations set forth in Articles 49 and 50.

Appellant and military counsel were present at the Article 32 hearing. Defense counsel examined the child extensively about her testimony. Throughout the lengthy cross-examination, the child's story remained essentially unchanged. At the court-martial, the military judge entered special findings that defense counsel's cross-examination at the Article 32 hearing

---

1. The defense portrays the result of their tactics, i.e., silencing the victim, as establishing that she was unable to perpetrate the lie when confronted with the truth. Certainly, this is one possible inference. Another is that the defense was scared to death of what she would say if permitted to testify. Suffice it to say, enough of the antics were conducted in front of the members to permit them to draw their own conclusions.

2. Another witness for the prosecution was a social worker—a "child advocate." This witness testified *in rebuttal* as to a supposed "child abuser profile." The purport of her testimony, in conjunction with the instructions provided by the military judge, was that the mere fact that appellant was educated, a chaplain, a professional, etc., did not assure that he could not have committed the crimes; child-abuse crimes have been committed by persons with such credentials. We do not comment on the propriety of such testimony as the issue is not presently before the Court.

had a two-fold purpose: impeachment and discovery.

This Court has long held that "[d]iscovery is not a prime object of the pretrial investigation." *United States v. Eggers*, 3 U.S.C.M.A. 191, 194, 11 C.M.R. 191, 194 (1953). Furthermore, regardless of defense counsel's assertions, the opportunity to cross-examine the witness was available to and used by him.

The "substantially verbatim" record of the child's Article 32 testimony, given under oath, was properly admitted into evidence against appellant and satisfies both the requirements of Mil.R.Evid. 804(b)(1) and the confrontation clause of the Sixth Amendment. *Ohio v. Roberts*, 448 U.S. 56, 67, 100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). *See also United States v. Crockett*, 21 M.J. 423 (C.M.A.), *cert. denied*, 479 U.S. 835, 107 S.Ct. 130, 93 L.Ed.2d 74 (1986), where Chief Judge Everett, writing for the Court, held that witnesses who lived in Florida and refused invitational travel orders to attend trial were "unavailable" for purposes of determining admissibility of their videotaped depositions; and because accused and his defense counsel were present and had an opportunity to object to testimony offered on direct examination and to cross-examine the witnesses, use of videotaped depositions did not deprive the accused of his Sixth Amendment right to confrontation.

[* Reporter's Note: The record also spells the name as Vandewalle.]

3. On a personal note, the "Dear Abby" column that appeared in the Fairfax Journal on September 24, 1987, provides the best concept I've seen to date of what victims of sexual abuse might experience, and it highlights some of the trauma which abused children endure. I took the time to obtain permission to reprint it, in toto, albeit such is probably not required in a legal opinion, for the benefit of all who might deal with these cases. *See* Appendix.

4. The series culminated with this exchange:
 Q. If in fact the things ... [the victim] described at the Article 32—and I believe you

We specified the second issue to determine:

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING MAJOR VANDERWALLE TO TESTIFY THAT HE BELIEVED THAT THE VICTIM HAD HAD ONE OR MORE SEXUAL ENCOUNTERS WITH APPELLANT AND THAT THE VICTIM BELIEVED THAT SHE HAD HAD A SEXUAL ENCOUNTER WITH HIM.

Dr. (Major) Michael B. Vanderwalle,* an expert in the field of child psychiatry, had examined the victim on several occasions. Over defense objection, the doctor was permitted to relate in considerable detail the content of statements made by the victim to him regarding what appellant had allegedly done to her. These statements were received as medical-history evidence under Mil.R.Evid. 803(4). The statements very closely matched the victim's Article 32 testimony. The doctor also explained how young childrens' perceptions are frequently exaggerated and distorted. He explained why children often delay in reporting such traumatic incidents, and he described the psychiatric traits and characteristics of children who had been sexually abused. He further opined that the victim displayed many of these traits and characteristics.[3]

At the outset, the Government acknowledged the impropriety of asking Dr. Vanderwalle whether he "believed" the victim's account of events. During recross-examination, however, *defense counsel* asked Dr. Vanderwalle about the credibility of the victim's claims.[4]

said you read the transcript—had happened, would you expect her to be a very very disturbed and upset child?
A. How do ...
Q. *Or didn't you believe that any of that was possible?*
A. Of what?
Q. *Or didn't you believe that any of that was possible?*
A. Of what—any of what?
Q. *What you read in the 32 transcript.*
A. I believe something could have happened, but I didn't necessarily believe all the stuff that was in the 32.
(Emphasis added.) Immediately after the doctor answered the questions, individual defense

When the doctor concluded his testimony, the court members presented several questions to the military judge for review. Relying on Mil.R.Evid. 704, which provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the judge ruled that the following questions could be asked.

> In your professional opinion do you believe that ... [the child] had a sexual encounter—one or more—with Captain Arruza?
>
> Second part. Does ... [the child] believe that she did have a sexual encounter with Captain Arruza?

The doctor's answer to both was in the affirmative.

This Court has consistently held that child-abuse experts are not permitted to opine as to the credibility or believability of victims or other witnesses. *United States v. Petersen*, 24 M.J. 283 (C.M.A.1987); *United States v. Deland*, 22 M.J. 70 (C.M.A.), *cert. denied*, 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986); *United States v. Cameron*, 21 M.J. 59 (C.M.A.1985). This holding is consistent with the decisions of Federal Circuit courts. *See United States v. Azure*, 801 F.2d 336 (8th Cir.1986). However, the rationale for this rule has varied. For example, in *United States v. Cameron, supra* at 62, we found that "[t]his testimony goes beyond the area of inquiry permitted by Mil.R.Evid. 608(a)," dealing with evidence of truthful character. Also, we have recognized that the testimony goes beyond the scope of the expertise of the witness who is not trained to be an

counsel barraged him with another series of questions, as follows:

Q: ... are you telling us that you believe that ... [the victim] was penetrated on seven to nine occasions by the accused?

A: No, I'm not. I don't think she was penetrated on seven to nine occasions.

Q: Are you telling us that ... [the victim] was forced to commit fellatio of the accused?

A: Can I state what I believe?

Q: Is that what you're telling us?

A: I'm—what I'm saying is that she was sexually molested by touching on at—on some occasions.

expert with "specialized knowledge ... to determine if a child-sexual-abuse victim was telling the truth." *United States v. Petersen, supra* at 284.

It also has been said that to permit an expert to opine as to the truthfulness of the victim puts "an impressively qualified expert's stamp of truthfulness on a witness' story [and] goes too far," *United States v. Azure, supra* at 340; and "that [a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.'" *Id., quoting United States v. Samara*, 643 F.2d 701, 705 (10th Cir.), *cert. denied*, 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981), *quoting United States v. Ward*, 169 F.2d 460, 462 (3d Cir.1948).

We recognize that the Military Rules of Evidence seem to invite the unwary to ask the expert whether he or she "believes the victim." Such information will often appear to "assist the trier of fact to understand the evidence or to determine a fact in issue." Mil.R.Evid. 702. Further, the expert's belief in the truthfulness of a victim may be essential to a diagnosis and treatment and, therefore, is the type of information "reasonably relied upon by experts in the particular field" of child abuse. Mil.R.Evid. 703. After all, how can the expert possibly determine how to help the child unless fantasy can be separated from reality? Moreover, opinions are not barred even if they relate to the "ultimate issue," Mil.R.Evid. 704; and the credibility of the victim is normally the "ultimate issue" in these cases.

\* \* \* \* \* \*

Q: She also says that she was raped; that she was penetrated; that she was forced ...

A: Right. There is where I would disagree with what she says, because I think that's—she doesn't have a concept of actually being penetrated, per se. She has an idea that that's what happened, but that is not what happened. Again, we get into this issue of distortion from this age group on what actually penetration is; what actually happened in her body.

It is, therefore, the interaction between Military Rules of Evidence 608(a), as it pertains to character evidence; 403, as it pertains to confusing the triers of fact (usurping their function); and the 700–series as they pertain to the use of experts, to which we must ultimately look for admissibility of the evidence. Based upon our study of the law in this area, we see no need to relax the general rule regarding the scope of the expert's opinion in child-abuse cases.

 Returning to the facts of this case, the members' question to Dr. Vanderwalle, "do you believe that ... [the child] had a sexual encounter," technically ran afoul of the rule and, therefore, should not have been permitted. The other question, "[d]oes ... [the child] believe that she did have a sexual encounter," is likewise objectionable under a strict application of the rule. Whether the error requires reversal presents a different question; however, admission of the two answers was harmless. Art. 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Weeks*, 20 M.J. 22 (C.M.A. 1985).

Several reasons exist for reaching this conclusion. As indicated, during recross-examination of Dr. Vanderwalle, defense counsel asked several questions dealing with whether the victim might have been lying or fantasizing. This line of questioning opened the door for the members to ask the questions now challenged before us.

Further, since the doctor's professional diagnosis was that the victim bore the psychiatric scars of having been molested, it is self-evident that he must have regarded her statements as credible at least to that extent. *See State v. Middleton*, 294 Or. 427, 657 P.2d 1215 (Ore.1983).

Moreover, it may be quite relevant to a diagnosis that the expert's opinion was premised upon the assumption that the victim was truthful. *See Ward v. State*, 519 So.2d 1082 (Fla.App., 1988). Such testimony, however, should be accompanied by cautionary instructions that the witness is not being offered as an expert in "truth-telling" and that the opinion is relevant only to assist the court members in understanding the medical diagnosis. The members should be reminded that it is *their* responsibility to make the determination of truthfulness.

Under the circumstances here, no error which prejudiced a substantial right of appellant is found. Art. 59(a).

The decision of the United States Army Court of Military Review is affirmed.

## APPENDIX

### *Promises, Promises—A Child's View of Incest*

I asked you for help and you told me you would if I told you the things my dad did to me. It was really hard for me to say all those things, but you told me to trust you—then you made me repeat them to 14 different strangers.

I asked you for privacy and you sent two policemen to my school in front of everyone, to "go downtown" for a talk in their black and white car—like I was the one being busted.

I asked you to believe me, and you said that you did, then you connected me to a lie detector, and took me to court where lawyers put me on trial like I was a liar.

I can't help it if I can't remember times or dates or explain why I couldn't tell my mom. Your questions got me confused—my confusion got you suspicious.

I asked you for help and you gave me a doctor with cold metal gadgets and cold hands ... just like my father, who said it wouldn't hurt, just like my father, who said not to cry. He said I look fine—good news for you. You said, bad news for my "case."

I asked you for confidentiality and you let the newspaper get my story. What does it matter that they left out my name when they put in my father's and our home address? Even my best friend's mother won't let her talk to me anymore.

I asked for protection and you gave me a social worker who patted my head and called me "Honey" (mostly because she could never remember my name). She sent me to live with strangers in another place, with a different school.

Do you know what it's like to live where there's a lock on the refrigerator, where you have to ask permission to use the shampoo, and where you can't use the phone to call your friends?

You get used to hearing, "Hi, I'm your new social worker, this is your new foster sister, dorm mother, group home." You tiptoe around like a perpetual guest and don't even get to see your own puppy grow up.

Do you know what it's like to have more social workers than friends?

Do you know what it feels like to be the one that everyone blames for all the trouble?

Even when they were speaking to me, all they talked about was lawyers, shrinks, fees and whether or not they'll lose the mortgage.

Do you know what it's like when your sisters hate you, and your brother calls you a liar? It's my word against my own father's. I'm 12 years old and he's the manager of a bank. You say you believe me—who cares, if nobody else does?

I asked you for help and you forced my mom to choose between us—she chose him, of course. She was scared and had a lot to lose. I had a lot to lose too—the difference was you never told me how much.

I asked you to put an end to the abuse—you put an end to my whole family. You took away my nights of hell and gave me days of hell instead. You've exchanged my private nightmare for a very public one.

—FEELINGS BY CINDY, AGE 12;
PUT INTO WORDS
BY KEE MacFARLANE

[Taken from the "Dear Abby" column, COPYRIGHT 1987 UNIVERSAL PRESS SYNDICATE. Reprinted with permission. All rights reserved.]

SULLIVAN, Judge (concurring in the result):

I believe the proper scope for expert testimony in this type of case was articulated in *United States v. Azure,* 801 F.2d 336, 340 (8th Cir.1986):

We agree that in these types of special circumstances some expert testimony may be helpful, but putting an impressively qualified expert's stamp of truthfulness on a witness' story goes too far in present circumstances. Dr. ten Bensel might have aided the jurors without usurping their exclusive function by generally testifying about a child's ability to separate truth from fantasy, by summarizing the medical evidence and expressing his opinion as to whether it was consistent with Wendy's story that she was sexually abused, or perhaps by discussing various patterns of consistency in the stories of child sexual abuse victims and comparing those patterns with patterns in Wendy's story. However, by going further and putting his stamp of believability on Wendy's entire story, Dr. ten Bensel essentially told the jury that Wendy was truthful in saying that Azure was the person who sexually abused her. No reliable test for truthfulness exists and Dr. ten Bensel was not qualified to judge the truthfulness of that part of Wendy's story. The jury may well have relied on his opinion and "surrender[ed] their own common sense in weighing testimony...." [United States v.] Barnard, 490 F.2d [907] at 912 [ (9th Cir. 1973), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974) ].

In the present case this line was crossed but only after the defense crossed the line itself. Accordingly, I would affirm because the defense opened the door for this testimony from Dr. Vanderwalle. *See generally* Art. 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a).

EVERETT, Chief Judge (dissenting):

I agree with Judge Sullivan's view of the proper scope of expert testimony. However, I do not agree with Judge Sullivan that the defense opened the door and, under the circumstances of this case, I would hold the error was prejudicial. Accordingly, I vote to grant a rehearing.