UNITED STATES, Appellee,

v.

**David M. JOHNSON, Technical Sergeant U.S. Air Force, Appellant.**

No. 66,676.

ACM 28263.

U.S. Court of Military Appeals.

Argued Feb. 12, 1992.

Decided Aug. 21, 1992.

For Appellant: *Captain Richard W. Aldrich* (argued); *Colonel Jeffrey R. Owens* and *Major Marilyn A. Gordon* (on brief).

For Appellee: *Captain Thomas E. Wand* (argued); *Lieutenant Colonel Brenda J. Hollis* and *Major Paul H. Blackwell, Jr.* (on brief); *Captain David G. Nix.*

---

*Opinion of the Court*

COX, Judge:

This case concerns the scope of expert-witness testimony in the area of child sexual abuse.[1] The witness, Mrs. Ruth Unger,

**1.** Appellant was tried by a general court-martial comprised of officer members at Davis–Monthan Air Force Base, Arizona. Contrary to his pleas, he was convicted of a single specification alleging divers instances of committing indecent acts on his stepdaughter, who was between 13 and 15 years of age at the times alleged. (According to her testimony in rebuttal, her "earliest memory" of appellant's molesting her was when she was about 5.) The Charge alleged a violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The members sentenced appellant to a dishonorable discharge, confinement and forfeiture of $100 pay per month for 5 years, and reduction to E–1. The members acquitted appellant of one specification of committing carnal knowledge and one specification of committing rape upon a minor,

alleged as violations of Article 120, UCMJ, 10 USC § 920.

The Court of Military Review, in a unpublished opinion dated April 4, 1991, 1991 WL 85327, affirmed the indecent-acts specification, but slightly shortened the duration of the misconduct charged in order to moot a statute-of-limitations question posed by deficiencies in the record regarding a possible break in appellant's service. *See United States v. Clardy,* 13 MJ 308 (CMA 1982). In reassessing the sentence, that court reduced the confinement and the forfeitures to 4 years; the remainder of the sentence was affirmed.

We granted review of this issue:

WHETHER THE EXPERT WITNESS [MRS. RUTH UNGER] TESTIFIED BEYOND THE

was an exceptionally qualified social worker/psychotherapist with extensive experience in child-sexual-abuse cases. Beyond her general expertise, she had been treating the alleged victim in this case for 5 months at the time of trial. Not surprisingly, Mrs. Unger had strong opinions about this case.

Of particular interest to us are Mrs. Unger's observations and opinions on the following sorts of topics: the behavior, emotions, feelings, thoughts, attitudes, reactions, etc., of sexually abused children in general; the "dynamics that characterize an incest family's interrelationship"; the typical manifestations of child abuse exhibited by the victim; a comparison of the victim's symptoms with "the symptoms of sexually abused children ... in terms of severity"; as well as the "interrelationships" of appellant's and the victim's families. Without defense objection, see infra, the witness was permitted to expound broadly on her experience and thoughts on these matters.

I

■ We start our analysis with some basics. Evidence must be relevant. Mil. R.Evid. 402, Manual for Courts–Martial, United States, 1984. It must tend to prove something pertinent. Mil.R.Evid. 401. Experts may testify if they are qualified and their testimony will be helpful, i.e., their "knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Mil.R.Evid. 702. Even evidence that is relevant and helpful "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members...." Mil.R.Evid. 403. The burden is on the proponent of · expert evidence to show that it is relevant and helpful. United States v. Gipson, 24 MJ 246, 253 (CMA 1987). The opposing party must make timely objection. Mil. R.Evid. 103(a)(1).

Experts can testify on several levels. See generally Imwinkelried, A Comparativist Critique of the Interface Between Hearsay and Expert Opinion in American Evidence Law, 33 B.C.L.Rev. 1 (1991). They may know nothing about the facts of the case, yet their background testimony about a science or discipline (the "major premise") may help the factfinder understand facts in issue. Thus where mental responsibility is in issue, a psychiatrist who has never examined the accused may present useful information about the general nature of certain forms of mental illness. On the other hand, experts may know something about the particular facts of the case (the "minor premise"). The psychiatrist, for example, may have examined the accused and may have useful information and observations about the accused's particular mental condition. Experts can also testify as to their conclusions—if they are shown to be reliable and helpful. Mil.R.Evid. 702 and 704. All such qualified testimony may be used by the factfinder to understand facts and draw conclusions.

Principles such as these are often easier to state than to apply. Especially in child-abuse cases, information is often imprecise, and courts and scholars are wrestling with testimonial boundaries. See generally Myers, et al., Expert Testimony in Child Sexual Abuse Litigation, 68 Neb. L.Rev. 1 (1989). Nevertheless, courts must endeavor to determine whether testimony such as Mrs. Unger's is relevant and helpful to the factfinder.

II

The prosecution's case against appellant consisted chiefly of the victim's testimony, the content of a telephone conversation between appellant and the victim,[2] and the

LIMITS SET BY THE MILITARY JUDGE TO THE SUBSTANTIAL PREJUDICE OF APPELLANT.

2. Upon the victim's report of the assaults, the case was initially investigated by Detective Benjamin Jimenez of the Tucson, Arizona, Police Department. With the consent of the victim, 15 at the time, and her mother (who had been divorced from appellant for several years), the victim was transported to a police station for

testimony of the expert, Mrs. Unger. At the time of the court-martial, Mrs. Unger had been involved with psychotherapy and clinical social work for many years. She had a master's degree in social work and had extensive experience in treating abused children, teaching, and establishing therapy programs. Retired from her public post, she had treated the victim in eighteen or nineteen sessions.

*In limine,* the defense moved to prohibit Mrs. Unger's testimony on the grounds "that the real purpose of Mrs. Unger is nothing more than a human lie detector," and "the only testimony that Mrs. Unger is really qualified to give is that this child may have experienced some type of traumatic event; but I don't believe she's qualified in any way to say what the traumatic event was." In a memorandum, the defense argued that Mrs. Unger's testimony would be unreliable and unhelpful. Attached to the memorandum were selections from the writings of various authorities challenging the validity of psychiatric, psychological, and sociological findings in general and of child-sexual-abuse conclusions in particular. A lengthy out-of-court hearing ensued during which Mrs. Unger was questioned about her qualifications, her observations and opinions regarding the victim, and her general observations about child-abuse patterns.

Upon consideration of written motions and argument of counsel, the military judge made extensive rulings.[3] Concluding that Mrs. Unger's testimony was relevant and helpful under Mil.R.Evid. 402 and 702, the judge denied the defense motion to prohibit Mrs. Unger's testimony in its entirety. He added, however, that

> Mrs. Unger may only testify to the characteristics of post-traumatic stress disorders and that ... [the victim] acted in conformity therewith. She [Mrs. Unger] may not testify that she believes ... [the victim] is telling the truth or that she believes ... [the victim] was, in fact, the victim of sexual abuse.

As advertised, Mrs. Unger described, on the merits, her concept of post-traumatic stress disorder. She also identified those attributes of post-traumatic stress disorder which she observed in the victim. Going further, Mrs. Unger opined, without de-

---

the purpose of placing a telephone call to appellant. Appellant terminated the first call abruptly, saying, "I'll talk to you tomorrow, okay?" The next day, they tried again; this time appellant engaged the victim in a lengthy conversation. At several points in the conversation, appellant evinced wariness and a concern that the victim's mother was present or that somebody might be overhearing the conversation. Despite the guarded nature of his comments, he made statements that appear to be outcome-determinative of the court-martial: statements utterly irreconcilable with a denial of molestation. Not only was somebody listening in, but unbeknownst to appellant, the entire conversation was being tape-recorded. *See* Appendix. These tapes were then introduced as prosecution exhibits, played on the merits at the court-martial, and reported verbatim.

3. *Inter alia,* he found:

1. Mrs. Unger is a clinical social worker who has worked in the area of sexual abuse since 1970. She holds an advanced degree, a Master's of Social Work, and has extensive experience in counseling the victims of sexual abuse, including children. She has had specialized training and maintains a currency in the areas of clinical social work, sexual abuse counseling, and post-traumatic stress disorders. Further, she established the child sexual abuse treatment program in Tucson, Arizona, while working for the Department of Economic Security, a state welfare agency.

\* \* \*

3. The evidence to which Mrs. Unger can provide information includes the characteristics or symptoms of individuals suffering from post-traumatic stress disorders and whether ... [the victim's] actions were in conformity therewith. This is relevant under Military Rule of Evidence 402 on the issues of consent to intercourse under the specification alleging rape, to the nature of coercion under the aspect of parental duress, and to explain delays by ... [the victim] in reporting the incidents.

4. ..... The fact that certain matters raised by the defense during their cross-examination of Mrs. Unger during the Article 39(a) session and in their brief may be in some conflict with the testimony of Mrs. Unger does not make her evidence any less admissible. Expert testimony in areas of social sciences are often in conflict, but that goes to the weight of the testimony, not its admissibility. Further, military case law has long recognized the admissibility of expert testimony in the area of post-traumatic stress disorders or rape trauma syndrome.

fense objection, that the victim suffered from "very, very serious" post-traumatic stress disorder. Mrs. Unger did not testify that she believed the victim, and she did not express an opinion that the victim had been sexually abused. *See United States v. Azure*, 801 F.2d 336 (8th Cir.1986); *United States v. Arruza*, 26 MJ 234 (CMA 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989).

As indicated, trial counsel also led Mrs. Unger to venture beyond the precise boundaries of the judge's ruling into the general area of sexually abused children and family patterns, and to the victim and her family in particular. Again, the defense did not complain.

On cross-examination, however, trial defense counsel was able to redirect Mrs. Unger's testimony back to the realm of relevance. As counsel established, for instance, she could cite no studies validating "the accuracy and reliability of evaluations by people like [her]self in this field." She agreed with defense counsel that the "characteristics" and "behaviors" exhibited by the victim were also "associated with a wide range of psychological problems that have nothing to do with sexual abuse." She also agreed that "anxiety" or "post-traumatic stress disorder" without "sexual behaviors" "serves only to establish that the child may have experienced some type of traumatic event but is not specific to sexual abuse." She agreed that the same type of "family patterns" she described as typical in abuse scenarios were also present in families where "no molestation" occurred. She acknowledged that the victim's new household featured "a great deal of domestic violence." She acknowledged being "very aware" that both the victim's mother and her new stepfather hit the victim, and that the new stepfather was an alcoholic who was not seeking treatment.

Earlier, on direct examination, Mrs. Unger allowed that the victim had witnessed violence between appellant and her mother, and that their divorce had been "unpleasant." On cross-examination, she acknowledged that a number of recent studies were reporting "the concern about children lying" about molestation. Finally, she agreed that "the only thing" she could "accurately say concerning ... [the victim] is that she has been traumatized by something."

Immediately after Mrs. Unger testified, the military judge gave this limiting instruction to the members:

Mr. President and members of the court, before we proceed further, I wanted to advise you that the testimony you just heard from Mrs. Ruth Unger must be considered by you for limited purposes only. You are not to infer that because ... [the victim] displays some symptoms of post-traumatic stress disorder—or stress syndrome—that sexual abuse against her must have occurred.

Mrs. Unger's testimony, including the basis and background of her testimony brought out in court, was offered by the government for the following limited purposes: To explain delays in reporting an offense, to explain the apparent absence of strong overt resistance during the alleged offenses in determining the issue of whether sexual intercourse was done without ... [the victim's] consent and whether parental duress existed, to explain the repeated return of ... [the victim] to the accused's residence where the alleged offenses occurred.

Once again, you must not conclude that because ... [the victim] apparently possesses symptoms of post-traumatic stress disorder, that sexual abuse of her has occurred.

The expert testimony of Mrs. Ruth Unger only serves to explain the testimony of ... [the victim] concerning the specific issues that I've described to you. It's your job as members of this court to make the ultimate determination as to where the truth lies in this area.

### III

Our formal threshold question is whether Mrs. Unger's testimony exceeded the limitations imposed by the judge. As indicated, the judge ostensibly limited her testimony to "the characteristics of post-trau-

matic stress disorders and that ... [the victim] acted in conformity therewith." The Court of Military Review concluded "that Mrs. Unger's testimony never strayed beyond these bounds." This conclusion was "reinforced by the failure of trial defense counsel to object to any of the questions presently complained of by appellate defense counsel." Unpub. op. at 4. For the purpose of discussion, however, we will assume that the testimony did exceed the limits imposed.

■ The next logical question is whether the objection was preserved. We conclude that it was not. Once the judge limited the scope of Mrs. Unger's testimony, it was incumbent upon the defense to protest transgressions thereof. Further, it does not follow that error occurred merely because the limits may have been exceeded. The purpose of the objection is to allow the parties and the judge the opportunity to address the relevance and admissibility of each piece of evidence. Therefore, in order for appellant to prevail on this appeal, it must now appear that *erroneous* testimony was permitted which constituted plain error and had the effect of "materially prejudic[ing] the substantial rights of the accused." Art. 59(a), UCMJ, 10 USC § 859(a).

We acknowledge concern over the propriety of some of Mrs. Unger's testimony, especially as it related anecdotally to generalized observations about characteristics and patterns found among supposedly incestuous families and to generalized descriptions of supposedly abused children.

*See* Myers, *et al.*, *supra* at 51 *et seq.* The problem with much of this testimony is that it proves nothing. It is meaningless that circumstances A, B, C, D, and E are often found in incestuous families or in sexually abused children if the same patterns are also present where there has been no sexual abuse.[4] *But cf. United States v. Palmer*, 33 MJ 7, 12 (CMA 1991); *United States v. Harrison*, 31 MJ 330, 332 (CMA 1990).

The risk is that the mere identification of profile-like factors or patterns may suggest that they are probative or corroborative of sexual abuse, when generally, as here, such claims are specifically renounced. The question is—if these "factors" and "patterns" do not prove or corroborate child abuse, why are they presented? What issues are they relevant to? How do they help the factfinder? Are they claimed to be necessary as background for court members to understand the actual evidence of abuse in the case? What reliability of such factors or patterns has been shown? *United States v. Gipson, supra.*[5]

In this case the risk of misuse was reduced to the vanishing point. First, on cross-examination, Mrs. Unger readily agreed that her descriptions of typical incest families also described many non-incest families and that her descriptions of sexually abused children also described many children who suffered trauma of a nonsexual nature. In sum, her testimony amounted to only what trial defense counsel conceded at the outset was proper—

4. The following snippet is illustrative:
   [TC] Well, what would be some of these dynamics that characterize an incest family's interrelationship?
   A There is a classic syndrome. A classic example would be a father who is more or less authoritarian, a mother extremely passive—extremely unemotional, unfeeling, who can't get in touch with her own feelings, who in relation to the spouse is most childlike—where there's a role reversal, where a child takes care of the mother, where there's role confusion, where the father sees the child almost like his wife, where there's control issues—maybe the father controls the family—those generally are the characteristics of a

classic. We have other kinds, but that's a classic incestuous family—where there's lack of communication. It's a disengaged family. Nobody knows what anybody else is doing. Nobody cares too much what anybody else is doing. And, in many of these families, we have fathers who have been molested as children and mothers who have been molested or raped as children or as adolescents. It's a very classical picture of what we see.

5. This is not to say that experts on child abuse can present no relevant comparative information. *See* Myers, *et al., Expert Testimony in Child Sexual Abuse Litigation,* 68 Neb.L.Rev. 1, 51 (1989).

"the only testimony that Mrs. Unger is really qualified to give is that this child may have experienced some type of traumatic event; but I don't believe she's qualified in any way to say what the traumatic event was."

Second, the military judge gave prompt and effective instructions limiting the members' use of Mrs. Unger's testimony to post-traumatic stress disorder matters not here in question. *See United States v. Reynolds*, 29 MJ 105 (CMA 1989); *United States v. Carter*, 26 MJ 428 (CMA 1988); *United States v. Nelson*, 25 MJ 110 (CMA 1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988).

Third, our assessment is that appellant's admissions (*see* Appendix) and the victim's testimony constituted the essence of this case. In comparison with this evidence, we doubt Mrs. Unger's testimony played a significant role.

Under the circumstances of this case, we conclude that any error was waived by the defense's failure to object during Mrs. Unger's testimony and that receipt of the testimony did not constitute such plain error as to materially prejudice the substantial rights of appellant. Art. 59(a).

The decision of the United States Air Force Court of Military Review is affirmed.

Judges CRAWFORD, GIERKE, and WISS concur.

### APPENDIX

The transcription of the telephone conversation between appellant and the victim consumes 25 pages in the record of trial. The following fragment, quoted by the Court of Military Review, is reprinted here as illustrative:

DMJ [Appellant]:—if you don't know if—if you come over here—and you see that I'm bothering you, don't come, but I told you I wasn't going to be bothering you. Okay? You just have to see for yourself. That's all I can tell you. You—you'll see that I'm not going to be bothering you. Okay?

[V]: Well—

DMJ: Okay? Just come and see. Okay?

[V]: I don't know. I think you need to get help, dad. I—I think I need to get help, too.

DMJ: Yeah.

[V]: Talk to somebody. I have to tell somebody. It's just—I can't keep holding things inside—

DMJ: Yeah. I told you that I'm not going to be bothering you, and you just come and see. Okay? And we'll try to have a good time; and I'm not going to be bothering you. Okay?

[V]: I—I have to tell somebody, dad. I—I've got to tell mom. Okay?

DMJ: Huh? If you tell mom something like that, do you know—do you know what's going to happen to me?

[V]: No. What?

DMJ: Huh?

[V]: What?

DMJ: I'll go to jail, and that—

[V]: Well—

DMJ: Okay?

[V]: Well, if you—maybe they won't do nothing if you admit it.

DMJ: It's a law, ... [victim].

[V]: Just—well, if—if you get help or something, they—they won't—I don't think they'll do anything to you.

DMJ: It's a law, ... [victim]. I'm trying to tell you. Okay? If you tell them I'm bothering you, you're under age. You're under 18 here, so—that's what I'm trying to tell you.

[V]: But why did you do it then?

DMJ: I told you I wasn't going to be—I'm not going to be bothering you. Okay?

[V]: Well, why did you do it before? I want to know why you did it. Is it because I'm not your real daughter or something?

DMJ: Okay, I'll tell you—when I pick ya'll up again, you—I'd rather talk in person than over the phone, okay?

[V]: I don't know if I—I want to go over there anymore.

DMJ: Uh—well you don't have to. That's what I'm telling you. This way—you don't have to come over here anymore. It's up to you.

[V]: Well, I'm in—I think I'm going to tell mom. I—I've got to tell somebody; and plus, if I—if I am pregnant or something, I'm going to be the one in trouble and I—I can't—there's no way I can deal with that.

DMJ: [Victim], why don't you just wait and see. You're not pregnant.

[V]: Well, dad, there's no other—

DMJ: I'll tell you. You're not pregnant. Don't—if you ain't messing with no other—no boy or nothing. You're not pregnant, okay?

SULLIVAN, Chief Judge (concurring in part and in the result):

In my view the answer to the granted issue is yes. Trial counsel asked a question comparing the child victim in this case

---

with "other ... sexually abused children." Mrs. Unger responded:

A. I would say she's one of the extreme—most extreme—traumatized children that I have seen.

This question and its answer clearly exceeded the limits of the expected testimony set by the military judge in the Article 39(a)* session, as noted by Judge Cox. 35 MJ at 19. Moreover, the evidence went beyond the line I drew in my separate opinion in *United States v. Arruza*, 26 MJ 234, 239 (CMA 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989), quoting *United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986). However, the defense did not object to this testimony, and its admission was not plain error. Mil. R.Evid. 103(a)(1) and (d), Manual for Courts–Martial, United States, 1984. Therefore, I would hold this error was waived. *United States v. Arruza, supra*.

---

* Uniform Code of Military Justice, 10 USC § 839(a).