**UNITED STATES, Appellee,**

v.

**Fletcher L. KING, Jr., Sergeant
U.S. Army, Appellant.**

**No. 66,531.
CM 9000228.**

U.S. Court of Military Appeals.

Argued Feb. 12, 1992.

Decided Sept. 25, 1992.

For Appellant: *Captain Holly K. Desmarais* (argued); *Colonel Robert B. Kirby* and *Captain Michael P. Moran* (on brief); *Major Michael J. Kelleher.*

For Appellee: *Captain Glenn L. Kirschner* (argued); *Colonel Dayton M. Cramer, Major Joseph C. Swetnam, Captain Timothy W. Lucas* (on brief); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Randy V. Cargill.*

*Opinion of the Court*

COX, Judge:

A general court-martial at Fort Hood, Texas, convicted appellant, contrary to his pleas, of two specifications of committing indecent acts on infants, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. Specifically, he was found to have committed the acts on his own 2–year–old daughter (J) and another 5–year–old girl (HM) by "encouraging and allowing" them "to kiss and lick the said SGT Fletcher L. King's penis and masturbating in the presence of ... [the girls] with intent to gratify the sexual desires of the said SGT Fletcher L. King."[1]

We granted review of two issues relating to the testimony of an expert witness called by the Government.[2] The first issue questions whether, during the merits portion of the trial, the expert improperly vouched for

1. The officers and enlisted members of the panel sentenced appellant to a dishonorable discharge, confinement for 4 years, and forfeiture of "all pay." The court-martial specified that the quarters allowance was to continue in favor of appellant's wife.

2. As framed by appellate defense counsel, those issues are:

I

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF AP-

the credibility of the victim. The second issue questions whether the witness exceeded the scope of her expertise when testifying during the sentencing portion of the trial. We conclude that, under the circumstances of the case, appellant was not prejudiced by the expert's testimony on findings, Art. 59(a), UCMJ, 10 USC § 859(a). However, as to sentencing, we deem her testimony so irrelevant and potentially prejudicial that we set aside appellant's punishment.

I

The prosecution's case on the merits consisted essentially of appellant's pretrial confession, the testimony of HM (the 5–year–old), the testimony of Mrs. M (HM's mother), and the testimony of the expert.

Mrs. M testified that, one Friday afternoon, she received a surprise telephone call at work from her regular babysitter. The sitter informed Mrs. M that she could not sit for HM the next day. Mrs. M, whose husband was in Korea on assignment, had to work all day Saturday. Being upset about the sudden cancellation, Mrs. M began discussing the problem with her coworkers. Mrs. King, appellant's wife, worked with Mrs. M; she volunteered appellant as a babysitter. He was to be home the next day taking care of their children, JK and PK. Mrs. M gratefully accepted.

The next day after work, Mrs. M drove to appellant's off-post house to pick up HM. Though Mrs. M had never socialized with the Kings, appellant was suddenly very insistent that the three of them immediately hire a babysitter for the children and "go out" for the evening. Taken

PELLANT IN ALLOWING, OVER DEFENSE OBJECTION, EXPERT TESTIMONY CONCERNING THE CREDIBILITY OF THE CHILD VICTIM.

II

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT IN ALLOWING AN EXPERT WITNESS TO TESTIFY INVOLVING MATTERS BEYOND HER EXPERTISE.

aback by this unexpected offer and tired after a day's work, Mrs. M declined. On the way home with HM, as Mrs. M described it:

> [W]e were only about five minutes from my house and we hadn't—we hadn't been talking, it was quiet in the car, except the radio was playing, and she leaned—crossed her hands over the seat, she was sitting in the back seat, behind me, leaned over the seat, and says to me, he made us—he made us do it, momma, he make us lick down there, and pointed between my legs.

Mrs. M was stunned and "started to shake." She became "a nervous wreck" and "didn't know what to do." She managed to get home, attempting to remain calm for HM's sake. When Mrs. M tried to get more information out of HM, "she just started crying and crawled up on my lap and said that she didn't want to talk about it."

The next day was Sunday and Mrs. M did not have to work. On Monday, she was scheduled to work but did not go because she "was having a hard time handling the whole situation" and she "didn't know how ... [she] could go to work and face Mrs. King." She notified her boss of "the situation"; the boss understood and gave her time off. To Mrs. M's surprise, she then received a call from appellant's wife, who wanted to know "what was wrong." Mrs. King "was extremely insistent on the phone, wanting to know why ... [Mrs. M] was not at work." Mrs. King, who had never called Mrs. M before, was "insistent, to the point that it didn't seem like a friendly, can I bring you something, are you ill[?]" Reluctantly, Mrs. M told Mrs. King that something had happened between appellant and HM the day before and that she did not want to talk about it over the phone.

To Mrs. M's amazement, Mrs. King, without skipping a beat, "had a ready excuse to explain all of this." According to Mrs. King, appellant had forewarned her

that he "was taking a bath and my daughter walked in and she saw him in the bathtub." Therefore, he cautioned, *"if [HM] started saying some things, that was why ...."* (Emphasis added.) Though she had been at work that day like Mrs. M, Mrs. King kept trying to convince Mrs. M that appellant's version was true. Mrs. M was struck by the fact "that they had already thought that [HM] was going to come home and tell me ...."

Immediately after Mrs. King's call, appellant called. He said to Mrs. M, "[W]hat's going on, Chris [Mrs. King] just called me and she's crying and very upset." Mrs. M. "told him, you know exactly what's going on and what the problem is." Mrs. M did not "remember exactly what ... [she] said after that because it was very heated, ... [she] was very upset to even hear him—hear his voice." Appellant, however, "was extremely calm, he never raised his voice." According to Mrs. M, "he says to me, well, if you—if there were problems and [HM] was telling you things, why didn't you just call me and ask me...." Whereupon Mrs. M told appellant what she thought of him in no uncertain terms, and she "slammed down the phone."

Presumably because the incident occurred off base, appellant was initially arrested by Detective Melissa Wetzel of the Harker Heights, Texas, police department. She advised appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which he waived. Agreeing to talk to Detective Wetzel, he proceeded to make what she considered to be "the easiest" confession she had taken in 5 years as a police officer.[3]

In part, in the sworn, written statement, appellant recites:

> [JK] got on the edge of the couch. She was facing me, but her knees were on the edge of the couch. I raised up and told her to get down. I pulled her down,

---

3. At trial, the defense challenged admission of the confession on the ground of lack of voluntariness. The correctness of the judge's decision to receive the confession is not before us.

and my penis was exposed. I got up and went and got a sheet. I put it on the couch and laid on the couch.... [HM] was in the den watching cartoons. Then, she got onto the couch and got under the covers with me. Then I don't know what happened or why. She wanted to tickle me. I got an erection. I don't know why. When she saw it, she grabbed it. She saw my belly button and she said "This is your belly button." And I said "Yeah." Then she started tickling my face. Then I said "Why don't you kiss it." I asked [HM] to kiss my penis. She was sitting on top of me. I was laying down on my back. Her right leg was across my waist. She leaned forward and kissed my penis. She kissed it about five times. She stopped and was just holding it with her hand. I don't know which hand she was holding it with. Then [JK] came into the den. [HM] told [JK] to lick my penis. [JK] came over to me and started licking my penis. [HM] was still sitting on me. [HM] had tried to change out of the clothes she wore when she first arrived. Because she got catsup on her top. Before we started playing, and before I got an erection she had taken off her clothes in an attempt to change. During the time that she kissed and held my penis, she was wearing only her underwear. I think [JK] was wearing some shorts and a top. It was after [JK] licked my penis that I began to masturbate. I ejaculated while I was laying down. I grabbed a shirt or towel and wiped myself off. I went to sleep for awhile after that. When I woke up, I took a bath. I have had thoughts of doing that in the past, but I don't think it was with a child.

The child, HM, also testified at appellant's court-martial. Her description of appellant's conduct equaled his in vividness.[4] This brings us to the first granted issue.

The expert, Dr. S, was called as a prosecution witness on the merits. She held a doctorate in education and Master's degrees in school psychology and education.

Her specialty was learning disabilities in children, and she had testified extensively as an expert in the area of child sexual abuse. Dr. S had evaluated the alleged victim, though the extent of evaluation is not clear in the record. The defense did not object to the witness' qualifications.

Dr. S's testimony on the merits was not lengthy. Trial counsel quickly focused on [w]hat does the—the literature in your profession suggest about whether children of the age five are capable of fabricating any or all of this?

(Emphasis added.) Upon defense counsel's prompt objection that the question called for an opinion of the child's truthfulness, trial counsel countered that "we're speaking in general terms of whether the witness—whether the literature suggests a propensity for general witnesses making this up and this—in this age group of five." (Emphasis added.) The military judge overruled the objection without explanation.

Trial counsel was then permitted to ask: "[D]o five year olds make this up?" The witness' response in part was:

No, they do not. They lack the sophistication to describe, anatomically correct, the parts of the body; they have had no experience, we hope, with issues such as ejaculation; they would not know about the issues surrounding sexual activity unless they had been involved in a concrete way. So they don't have abstract ability that it would take to make up a story and then also make up events to match it....

(Emphasis added.)

Trial counsel then asked: "At what age do children normally form that opinion—or, that ability?" The response was:

You—again, the literature would say you'd have to have at least a twelve year old intellectual level to begin to abstract out and think through and pull a story together that was that fanciful and understand that you've got to have physical characteristics that match activities. It

---

4. Psychological testing placed HM "in the superior to gifted range" of intelligence.

*would just—you could have a teenager lie about this because they were angry about curfews or—or hated the stepfather, but not a five year old.*

(Emphasis added.)

## II

We perceive several problems with this testimony, first as to form. When certain foundational prerequisites have been met, experts are permitted to testify about their *knowledge, observations,* and *opinions. E.g.,* Mil.R.Evid. 702, Manual for Courts-Martial, United States, 1984; *United States v. Johnson,* 35 MJ 17 (CMA 1992). That is the reason experts are permitted to testify. There is a completely separate rule for introducing simply "the literature." That would be the learned-treatise exception to the rule against hearsay, Mil. R.Evid. 803(18). That rule, which has foundational requirements of its own, was not invoked in this case.

■ It is true, however, that, depending on relevance and other factors, *see United States v. Gipson,* 24 MJ 246 (CMA 1987), experts are often allowed to explain the *basis* for opinions. Moreover, under certain circumstances, the basis may include the studies, findings, and conclusions of others. *See* Mil.R.Evid. 703 and 705; Imwinkelried, *A Comparativist Critique of the Interface Between Hearsay and Expert Opinion in American Evidence Law* [hereafter Imwinkelried], 33 Boston College L.Rev. 1 (1991). That assumes, however, that the expert first has an opinion. Beyond the strictures of Mil.R.Evid. 703 and 803(18), experts are not licensed to ascend the witness stand and commence spouting hearsay generally.

We recognize that the literature-survey references here might merely denote clumsy attempts to solicit opinions of sorts. Given the lack of defense objection as to form, we will assume that to be so. In the future, however, we expect more focused examinations of experts, as careless expert-witness practice quickly leads to serious problems. The *substance* of this witness' testimony is an example.

## III

■ We can accept the proposition that 5–year–olds are not likely to have discovered on their own that "blue water" issues forth from penises after they have been licked. Thus, we will assume HM did not wholly invent the *concepts* she related out of thin air. Obviously she was exposed to them in some way; the question is how? Was she coached? Did she see it in a pornographic cartoon? Or did it happen to her? Neutral testimony to the effect of when children might normally be expected to know such things would seem unobjectionable. Moreover, if a proper foundation could be shown, *see United States v. Gipson, supra,* it is conceivable that an expert might be able to hazard an opinion as to *how* HM came to know the information.

Unfortunately, no foundation for such expertise was shown, and trial counsel's questions went straight to credibility. Plainly he was after expert bolstering when he asked Dr. S "whether children of the age five are *capable of fabricating any or all of this?,*" and "*[D]o five year olds make this up?*" (Emphasis added.) By "this" trial counsel was clearly referring to the events as related by HM. Naturally, given the questions, Dr. S's responses were also oriented to credibility: *"No, they do not"*; and *"[Y]ou could have a teenager lie about this because they were angry about curfews or—or hated the stepfather, but not a five year old."* (Emphasis added.)

If the testimony of Dr. S stood for the proposition that 5–year–olds are incapable of fabricating things in general, or making things up, or transferring concepts, or being confused, or following a parent's instructions, her position would be counterintuitive to say the least. If everything a 5–year–old says must have happened and must have been experienced exactly as reported, that is news to us. Yet we agree that the age at which children normally develop the "capability" of "fabricating" is often quite germane and is precisely the sort of thing a person of Dr. S's qualifica-

tions ought to have an opinion about. Cross-examination should be more than sufficient to point out any deficient or inconsistent claims.

If Dr. S's view was that HM did not make up *"this"* or lie about *"this"* (emphasis added), which we take to be the actual tenor of the dialogue, then her testimony was clearly inadmissible. *See United States v. Azure*, 801 F.2d 336 (8th Cir. 1986); *United States v. Arruza*, 26 MJ 234 (CMA 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). Absent some foundation demonstrating a capability not heretofore observed, *see United States v. Gipson, supra*, we do not allow witness opinion regarding the truthfulness of another person. In our view, Dr. S's testimony—as elicited by trial counsel—plainly crossed the bounds of propriety in this case. Appellant's objection was well-founded.

■ This type of testimony illustrates how dangerous it is for judges to receive uncritically just anything an expert wants to say. The evaluation of expert testimony does not end with a recitation of academic degrees. *Everything the expert says* has to be relevant, reliable, and helpful to the factfinder. A rational and demonstrable basis is the *sine qua non* of expert opinion.

■ As it happens, however, in light of the other evidence in the case—particularly appellant's confession—it does not appear that appellant was prejudiced as to findings by receipt of this testimony. Art. 59(a). Regarding the sentence adjudged, the same cannot be said.

### IV

■ On sentencing, Dr. S was recalled as a prosecution witness. After trial counsel established that Dr. S had reviewed appellant's confession and that she had "spoken to ... [HM] on several occasions," trial counsel launched into a series of questions about pedophiles. At trial counsel's request, the witness listed three types of pedophiles: the "fixated" pedophile, the "regressive" pedophile, and the "indiscrimi-

nate" pedophile. As requested, she further described the "regressive" pedophile. Then trial counsel asked, "Where did you put Sergeant King?" Dr. S responded: "In the regressive pedophile."

Asked then about the prospects for treatment and rehabilitation of regressive pedophiles, the witness responded:

Well, the statistics are very depressing. *What we know is* that by the time the average, if there is such a thing, sexual offender of children is apprehended, *they most frequently, statistically, have molested fifty children, hundreds of times. So you're really not looking at one act.* And I—I have never had the experience of working with anybody who's been caught the first time. *So it's a long time sexual preference that has begun with what we call the gentle rapist syndrome.* It's like a rainbow, if you will, a spectrum. It starts with fondling, inappropriate bathing of children, prolonged kissing like you would find where there was sexual passion involved, nudity in the home, almost always involves pornography, and it just gradually progresses and the very end of the continuum is oral sex or intercourse. *So, in this particular case, you're looking at the very end of a continuum which probably did, in fact, start a long time ago.*

(Emphasis added.)

Amazingly, the military judge and civilian defense counsel said nothing—and trial counsel was permitted to continue. In response to the next question about "the prognosis for a person who's a regressive pedophile who receives no treatment," the witness declared:

What the literature says is that fifty percent or better of these people have had sexual interaction with their own child in an incestuous relationship, have molested a child outside the family, *and have at least one forcible rape in their past behavior.* The average, without treatment, they start molesting within

four weeks of the time they're released
....

(Emphasis added.) And on and on.

Regarding the prognosis for appellant's 2–year–old daughter, Dr. S. testified that she's damaged for life. *You cannot ask a child to agree to give her consent to a lifetime of drug abuse, teenage pregnancy, school drop out. Eighty-five percent of all your prostitutes were sexually abused by a close member of the family* in the home, prior to the age of thirteen.

(Emphasis added.)

Cross-examination of the witness reestablished that her doctorate was in education (though she had studied psychology extensively), that she had no knowledge of any misconduct by appellant beyond the charged acts, and that her only knowledge of appellant was derived from reading his pretrial statement. There is no indication that she ever practiced psychology. Her numerous opinions about appellant and her visions about his past and future conduct came through her "aware[ness] of a pattern," a pattern based on unspecified "research" involving "hundreds of cases." As she put it, regarding the behavior of a pedophile:

It's—only the name changes, sir. The behavior is almost identical.

Recognizing the damage caused appellant by the witness, the military judge granted a continuance to permit the defense to have appellant evaluated by an expert "to make a diagnosis of the sort that Dr.... [S] attempts to make from one confession and talking with the victim only." The expert who was hired for this purpose examined appellant and opined that his documented history of sexual involvement with children was of insufficient duration to qualify him as a regressive pedophile under the prevailing standards of the American Psychiatric Association. Nonetheless, based on appellant's known conduct, the defense expert was far from encouraging about his chances for rehabilitation.

We will not dwell unduly on the matter. It was not shown that Dr. S was in any position to pronounce on appellant's condition and prospects, either by way of her training and experience or by way of her knowledge about appellant. Further, her gratuitous generalizations about appellant *qua* pedophile and the consequences of his conduct on his own daughter, JK, appear to be utterly irrelevant, being made completely without reference to either appellant or his daughter.

People accused of crime—as well as their alleged victims—are discrete individuals. It is not "only the name [that] changes." They are not some mosaic or composite of 20 or 30 years worth of other people. Counsel will do well to limit their witnesses to people who either have a basis for making generalizations that bear a rational relationship to issues in the case or who know something germane about the subject of a given court-martial. *See* Imwinkelried, *supra*.

We judge this sentencing evidence so inappropriate and prejudicial that its receipt in evidence, despite lack of objection, constituted plain error. *United States v. Fisher*, 21 MJ 327 (CMA 1986); *see also United States v. Cousins*, 35 MJ 70 (CMA 1992). Nothing short of a new hearing on sentence will suffice. Permitting the defense to call its own witness did not effectively ameliorate the damage.

The decision of the United States Army Court of Military Review, 32 MJ 709, is reversed as to sentence. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on the sentence may be ordered.

Judge GIERKE concurs.

WISS, Judge (concurring):

I concur completely. In *United States v. Stinson*, 34 MJ 233, 241 (CMA 1992) (Wiss, J., concurring in part and in the result), I expressed my concern for the inclination of expert witnesses on occasion to stray beyond the perimeters of their expertise that

is established in the record and, as well, to offer prognosis testimony that is not related to knowledge of the individual of concern, whether that be the accused or a victim. Accordingly, I heartily embrace the principal opinion's acknowledgement of both of these difficulties in this case.

SULLIVAN, Chief Judge (concurring in part and dissenting in part):

I find no error in admitting the challenged expert's testimony concerning the general truth-telling ability of 5 year olds. *See United States v. Arruza*, 26 M.J. 234, 239 (CMA 1988) * (Sullivan, J., concurring in the result), citing *United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986). As for sentencing error, it was waived by defense counsel's failure to object. Moreover, in view of the continuance granted by the military judge and the defense's presentation of an opposing expert, I see no plain error. *See United States v. Johnson*, 35 M.J. 17, 23 (CMA 1992) (Sullivan, C.J., concurring in part and in the result).

CRAWFORD, Judge (concurring in part and dissenting in part):

I agree with the principal opinion's excellent analysis as to Parts I, II and III. However, I must respectfully dissent from the majority's holding as to Part IV. The record indicates that appellant was represented by a very experienced civilian counsel. That counsel strategically chose not to object to the testimony of Dr. S. Furthermore, he was granted a continuance in order to produce his own witness whom he apparently thought would be more effective.

* *Cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103

Mil.R.Evid. 103, Manual for Courts Martial, United States, 1984, provides:

(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless the ruling materially prejudices a substantial right of a party, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context....

The purpose of this rule is to place the responsibility to raise evidentiary objections where it should be: upon defense counsel, and not upon the trial or appellate courts. As indicated by defense counsel during an Article 39(a), Uniform Code of Military Justice, 10 USC § 839(a), session outside the hearing of the court members, there was no evidence to show that appellant had ever been involved to the extent indicated by Dr. S. In fact, defense counsel said her testimony was "ridiculous." He took the view that the testimony was so unreasonable that it would fall on its own weight. Furthermore, defense counsel very effectively cross-examined the witness and demonstrated that her testimony was only based on appellant's confession and talking to the victim. *United States v. Johnson*, 35 MJ 17 (CMA 1992). Any sting from this testimony was removed by more than a week's delay so the defense could call its own expert witness.

Accordingly, I would affirm the decision of the Court of Military Review in its entirety.