UNITED STATES, Appellee

v.

Lawrence M. YOUNGBERG, Private
U.S. Army, Appellant.

No. 94–0237.
CMR No. 9201589.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 21, 1995.

Decided Sept. 29, 1995.

For Appellant: *Major Michael A. Egan* (argued); *Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker, Captain Clement B. Lewis, III* (on brief).

For Appellee: *Captain John W. O'Brien* (argued); *Colonel John M. Smith, Lieutenant Colonel James L. Pohl, Major Lyle D. Jentzer* (on brief); *Captain Glenn L. Kirschner.*

*Opinion of the Court*

SULLIVAN, Chief Judge:

1. In June and July of 1992 appellant was tried by a general court-martial composed of officer members at Bad Kreuznach, Germany. Contrary to his pleas, he was found guilty of premeditated murder and committing an indecent act, in violation of Articles 118 and 134, Uniform Code of Military Justice, 10 USC §§ 918 and 934, respectively. The members sentenced appellant to a dishonorable discharge, confinement for life, total forfeitures, and reduction to Private E–1. On September 15, 1992, the convening authority approved the sentence as adjudged. On November 5, 1993, the Court of Military Review[1] affirmed the findings of guilty and the sentence. 38 MJ 635.

1. *See* 41 MJ 213, 229 n. * (1994).

2. On June 1, 1994, this Court granted review[2] on the following issues raised by appellate defense counsel:

I

WHETHER THE MILITARY JUDGE ERRED WHEN HE ADMITTED EVIDENCE OF THE DNA [DEOXYRIBONUCLEIC ACID] TESTING.

II

WHETHER THE MILITARY JUDGE ERRED WHEN HE ADMITTED EVIDENCE OF DNA TESTING AND SEROLOGY AND FIBER [ANALYSIS] WITHOUT ADEQUATE FOUNDATION.

We hold that the military judge did not erroneously rely on *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), in admitting expert testimony of DNA testing or any other scientific evidence in this case. *See* Mil. R.Evid. 702, Manual for Courts–Martial, United States, 1984, and *United States v. Gipson,* 24 MJ 246 (CMA 1987). In addition, we hold that the judge did not abuse his discretion or otherwise err by admitting evidence of DNA, or of blood, fiber, and shoe-print analysis in this case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Nimmer,* 43 MJ 252 (1995); *see also United States v. Johnson,* 35 MJ 17, 18 (CMA 1992).

3. This appeal arises out of the August 24, 1991, murder of a 30–year old German National woman (TW) in Bad Kreuznach, Germany. Ms. W's naked body was found impaled on a 2–foot wooden stake which had been thrust into her vagina with sufficient force to travel through her abdomen, ultimately resting at the level of her liver. Her mouth and throat were filled with small rocks. Moreover, Ms. W's head had been partially crushed because of repeated strikes from a 10–pound segment of concrete.

4. Evidence taken from the crime scene included a condom containing semen and a bloody shoe print found on Ms. W's body. At trial the Government sought to link appellant to Ms. W by introducing bloody shoe-print and fiber-analysis evidence. The Government also presented DNA evidence to show that the semen found in the condom taken from the crime scene matched appellant's DNA pattern.

5. Defense counsel made a motion *in limine* to suppress evidence of DNA testing. During a lengthy suppression hearing, the Government produced Doctor Reiner Wenzel, a German national employed by the State Crime Laboratory, Department of Biology. The military judge qualified Dr. Wenzel as an expert in the field of "forensic DNA testing or genetic fingerprinting." Dr. Wenzel explained what DNA is and outlined the two different methods scientists employ when conducting DNA analysis.

6. These methods were described as RFLP (restriction fragment length polymorphism) analysis and PCR (polymerase chain reaction) technique. He further testified that DNA testing is "generally accepted in the scientific community" and that test re-

---

**2.** We heard oral argument in this case at the University of Virginia School of Law, Charlottesville, Virginia, on February 21, 1995, without objection from the parties involved. *See* Foundation of the Federal Bar Association, Equal Justice Under the Law: *The Supreme Court in American Life* 15–18 (1965); *see also* D. O'Brien, *Storm Center: The Supreme Court in American Politics* 78, 135–40 (2d ed. 1990). This procedure is similar to the well-established practice of the United States Court of Appeals for the Eighth Circuit which holds hearings at various law schools within its circuit.

The United States Court of Appeals of the Armed Forces conducts a hearing such as this outside its permanent courthouse in Washington, D.C., as part of its "Project Outreach," a public awareness project which demonstrates not only the operation of a Federal appellate court but also the quality and effectiveness of the criminal justice system of our Armed Forces and the Uniform Code of Military Justice (Arts. 1–146, 10 USC §§ 801–946, respectively). It is hoped that the thousands of students, servicemembers, military and civilian attorneys, and members of the American public who witness these hearings will realize that America is a democracy that can maintain an Armed Force instilled with the appropriate discipline to make it a world power. and yet afford the members of that Armed Force a fair and impartial justice system which does provide the full protection of the Constitution of the United States and Federal law to its members.

sults can be duplicated. Dr. Wenzel stated that his laboratory used RFLP analysis as did the FBI and "[a]lmost every major laboratory in the United States."

7. Dr. Wenzel outlined the procedural steps typically employed by his laboratory to conduct RFLP analysis after blood samples have been taken:

The DNA will then be extracted from the white blood cells.... In a second step we then add an enzyme which is a restriction enzyme. This restriction enzyme might be compared to a pair of scissors, a pair of molecular scissors cutting the DNA into fragments at certain marked locations.... [T]his mixture of fragments will be sorted and classified according to the length of the individual fragments on agarose gel after electrophoresis.... In the next step the various fragments will be transferred to a membrane while maintaining their exact position. This transfer being known as the so called "Southern Transfer".... This membrane is then subjected to a certain treatment which we call hybridization. This is when the one particular fragment whose lengths varies from one person to the next is made visible .... by taking a short piece of DNA which is commercially available and marking it radioactively.... [Then] all of the fragments which are not specifically banded, will be washed out. What we are then left with in the last step is this pattern, this set of tracks as we call them, where the one fragment, which we are interested in will be found in certain locations marked radioactively. An x-ray film is then superimposed on this membrane. It will be exposed for a certain time and wherever there is a radioactive piece the film will be blackened. This gives you what we then call the DNA profile....

8. Both trial and defense counsel questioned Dr. Wenzel regarding compliance with accepted procedures in this particular case. Dr. Wenzel testified that the samples matched appellant's. He explained the probability of a match and was questioned by both trial and defense counsel on the methods used to generate his statistical calculations.

9. The military judge ruled on the defense suppression motion as follows:

Regarding the DNA issue, this motion, I believe, was styled as a motion *in limine* to prevent the Government from introducing the DNA genetic fingerprinting testimony, that motion is denied.

I make the following findings: I find that the underlying principles and techniques used for DNA genetic fingerprinting are sound and reliable. The test is not whether they are infallible. There is some room for error; no test is perfect, as acknowledged by Dr. Wenzel, but *I find that the underlying principles and techniques are sufficiently reliable to warrant use in the courtroom. I find that they are generally accepted in the scientific community. I find that the techniques used by Dr. Wenzel comport with generally accepted protocol for DNA testing.* The fact that different probes may have been used by Dr. Wenzel than are used in other labs, such as the FBI lab or, perhaps, the CID lab in that these probes look at different chromosomes, that the use of marker lanes may vary from lab to lab does not affect the reliability of the testing procedures.

*I find that admitting the evidence will not overwhelm or confuse or mislead the jury. I find that there is a connection between the scientific result to be presented and a disputed factual issue in the case-that is: the source of the elements in the condom that was found at the scene.* I find that the evidence is sufficiently reliable to warrant its use in the courtroom. *It's relevant to a fact in issue.* Its probative value is not substantially outweighed by the danger of any unfair prejudice.

Assuming—not assuming, it's—I will admit it, provided the Government can show in court the relevance of the items that were tested to this case, that being the two blood samples and the condom. Are there any questions from the Government?

ATC: No, sir.

(Emphasis added.)

10. Also, at trial, the judge overruled defense counsel's chain-of-custody objections

related to fiber-analysis evidence and blood-analysis evidence derived from materials taken from the victim and appellant. Defense counsel did not specifically object to the scientific validity of fiber analysis or of blood-analysis evidence but did object to the scientific validity of blood analysis taken from clothing. In addition, defense counsel made a limited objection to expert testimony by Mr. Kiefer concerning evidence of shoe-print analysis.

---

## I

### Background

11. The critical issue at this court-martial was the identification of appellant as the assailant of Ms. W, the murder victim. The prosecution largely relied on trace evidence,[3] *i.e.,* DNA, blood, fibers, and shoe prints as explained by qualified experts to link appellant to the murder. *See* Mil.R.Evid. 702–05. On appeal, appellant challenges admissibility of the prosecution's scientific evidence on the grounds that *a proper foundation* for admission of such evidence was neither correctly determined nor sufficiently established at his court-martial. He does not, however, pursue his chain-of-custody objections on this appeal. *See generally United States v. Maxwell*, 38 MJ 148 (CMA 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994).

▪ 12. The word "foundation" in the context of admission of evidence may vary, depending on the type of evidence sought to be admitted. *See* Mil.R.Evid. 104(a) and 602.[4] However, it is generally defined as follows:

3. Trace evidence is generally explained as follows:

The presence upon the person or premises in question of articles, fragments, stains, tools, or any other resulting circumstance is constantly employed as the basis of an inference that the person did an act with which these circumstances are associated.

1A Wigmore, Evidence § 149 at 1745 (Tillers rev. 1983).

4. These Rules state:

**Rule 104. Preliminary questions**
(a) *Questions of admissibility generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a

This class of evidence is described as foundation or *qualifying proof,* not only for the purpose of determining relevancy but for the purpose of ascertaining whether the requirements imposed as conditions for admissibility have been complied with. The *determination of compliance with such* conditions and the sufficiency of evidence to support them is, so far as admissibility is concerned, for the determination of the judge, not the jury.

1 *Jones on Evidence* § 4:59 at 511 (6th ed. 1972) (emphasis added).

13. The Third Circuit in *United States v. Downing,* 753 F.2d 1224, 1232 (1985), stated the following concerning the particular foundational requirements for admission of scientific evidence:

Courts and commentators have divided over the issue of the foundational requirements for the admission of scientific testimony. Evidence that derives from principles and techniques of uncontroverted validity is, of course, readily admissible, subject to the qualification of the proposed witness and, in some jurisdictions, to a showing that proper safeguards were employed in obtaining the evidence on the relevant occasion. Where proffered evidence arises from a novel form of scientific expertise, however, courts and commentators have taken any one of several different approaches to the question of admissibility. . . .

(Footnote omitted.)

14. We note that for many years the so-called "general acceptance" standard (in the

privilege, the admissibility of evidence, an application for a continuance, or the availability of a witness shall be determined by the military judge. In making these determinations, the military judge is not bound by the rules of evidence except those with respect to privileges.

**Rule 602. Lack of personal knowledge**
A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness. This rule is subject to the provisions of Mil.R.Evid. 703, relating to opinion testimony by expert witnesses.

scientific community) governed admission of new types of scientific evidence in federal civilian courts and courts-martial. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *see also United States v. Hulen*, 3 MJ 275, 276 (CMA 1977); *United States v. Ford*, 4 USCMA 611, 16 CMR 185 (1954). However, *Frye's* hold on this area of Federal civilian law became less certain with the adoption in 1975 of Fed.R.Evid. 702 and its "helpfulness" test. *See United States v. Downing*, 753 F.2d at 1230 and 1235. Moreover, this problem became pressing in the military justice system in 1980, with the adoption of Mil. R.Evid. 702,[5] the military counterpart of Fed. R.Evid. 702. *See United States v. Gipson*, 24 MJ at 250–51.

■■■ 15. In 1987 this Court concluded "that *Frye* has been superseded [by the Federal Rules of Evidence] and 'should be rejected as an independent controlling standard of admissibility.'" *United States v. Gipson*, 24 MJ at 251, quoting 753 F.2d at 1237. In 1993 the Supreme Court, noting the "sharp divisions among the courts regarding the proper standard for the admission of expert testimony," 509 U.S. at 585, 113 S.Ct. at 2792, ruled that "the *Frye* test was superseded by the adoption of the Federal Rules of Evidence." *Id.* at 587, 113 S.Ct. at 2793. The *Daubert* Court further opined that *Frye's* "rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules." *Id.* at 588, 113 S.Ct. at 2794. From now on, stated the Court, instead of an inflexible standard of general acceptance, "judge[s] must ensure that any and all scientific testimony or evidence admitted is ... relevant [and] reliable." *Id.* at 589, 113 S.Ct. at 2795. Moreover, reliability means "scientific validity" and its "focus ... must be solely on principles and methodology, not on the conclusions that they generate ... [as] [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky but admissible evidence." *Id.* at 596, 113 S.Ct. at 2797–98.

16. The Supreme Court in *Daubert* also indicated four factors which can be considered in determining whether expert testimony of this type should be considered scientifically valid for purpose of Fed.R.Evid. 702. The Sixth Circuit in *United States v. Bonds*, 12 F.3d 540 (1993), has summarized them as follows:

[W]e now turn to the four factors that the Supreme Court observed would bear on a determination of whether the testimony pertains to scientific knowledge that will assist the trier of fact: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Id.* at 558. *Cf. United States v. Rodriguez*, 37 MJ 448, 455 (CMA 1993) (Crawford, J., concurring in the result).

II

Initial Argument

■■■ 17. Appellant presents a combined argument in his brief concerning the two granted issues, despite the fact that his contentions are distinct and are applied to different types of scientific evidence. He initially objects to admission of DNA evidence in his case because "the military judge solely used the superseded *Frye* standard in admitting the DNA fingerprinting testimony" (Final Brief at 6), instead of the "new" test for admissibility articulated in *Daubert*. In other words, he contends that, because an outdated test was used, a proper foundation for admission of this scientific evidence could not be established as a matter of law at his court-

---

**5.** Mil.R.Evid. 702, which is taken verbatim from the Federal Rules of Evidence, states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

martial. He later expands this argument to include similar attacks on the blood, fiber, and shoe-print analysis evidence admitted in his case.

18. We initially note that the concept of general acceptance remains a permissible, although not required, basis for admission of scientific evidence under *Daubert.* *See* 509 U.S. at 594, 113 S.Ct. at 2797. Arguably, a trial judge's decision finding expert testimony scientifically valid could be sustained on this basis alone. *See United States v. Bonds,* 12 F.3d at 566 n. 21. In any event, the military judge clearly did not solely rely on the superseded *Frye* test in this case. As observed earlier, this Court affirmatively disassociated military law from *Frye* in 1987. *See United States v. Gipson, supra* at 251. For example, the military judge's ruling on DNA in this case expressly contained relevance and reliability determinations as required by *Gipson* and *Daubert.* ¶ 2. Finally, *Gipson* references *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985), a case which delineates foundational considerations similar to those noted in *Daubert.* *See* 509 U.S. at 594–95 n. 12, 113 S.Ct. at 2797 n. 12. *United States v. Gipson, supra* at 252. Accordingly, we reject appellant's initial argument in this case and conclude that the military judge's rulings need not be found erroneous simply because they pre-dated *Daubert.* *See United States v. Bonds, supra* at 556 (findings under "pre-*Daubert Frye*" test "relevant" to "*Daubert* analysis"); *United States v. Dorsey,* 45 F.3d 809, 814 (4th Cir.) (rejecting bare pre-*Daubert* argument), *cert. denied,* —— U.S. ——, 115 S.Ct. 2631, 132 L.Ed.2d 871 (1995).

III

Appellant's Alternative Complaints

19. Appellant's second argument is that an adequate "foundation" was not particularly established at his court-martial for admission of evidence of DNA testing or of the serology and fiber analysis under *Daubert.*

In his brief, he further asserts that evidence of "footprint" analysis was also erroneously admitted without regard to a proper foundation. In particular, he complains that "the factors listed in *Daubert* were not met by the trial testimony concerning fiber analysis or footprint matching techniques. There was no evidence presented establishing testing of theory or technique; peer review or publication; error rates; or standard to ensure accurate results." Final Brief at 9.

20. At the outset, we note that appellant's case was tried in June and July of 1992, almost one year before the Supreme Court issued its opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the judge's failure to make specific references to that decision or the precise foundational factors articulated therein is understandable. However, Mil.R.Evid. 702 was in effect at the time of appellant's trial, and the decision of this Court in *United States v. Gipson,* 24 MJ 246 (1987), had also been handed down some 5 years earlier. Since *Gipson* generally foreshadowed *Daubert* and is substantially consistent with that Supreme Court decision, we will entertain appellant's arguments against admissibility of government evidence based on the four foundational considerations delineated in *Daubert.*[6] *See United States v. Nimmer,* 43 MJ 252 (1995); *see also United States v. Dorsey,* 45 F.3d at 813–15.

21. Admissibility of DNA evidence at a court-martial is a question of first impression before this Court, although many federal appellate courts have found it admissible provided an adequate foundation is laid. *See United States v. Davis,* 40 F.3d 1069 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995); *United States v. Chischilly,* 30 F.3d 1144 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115

6. An overlooked question on this appeal is whether admission of expert testimony at appellant's court-martial should even be governed by *Daubert.* *But see United States v. Melvin,* 27 F.3d 703, 706 n. 4 (1st Cir.1994); *United States v. Bonds,* 12 F.3d 540, 556 (6th Cir.1993). However, here appellant asks that this Supreme Court decision be applied to his case to determine the propriety of prosecution evidence admitted under pre-*Daubert* case law. *Cf. United States v. Nimmer,* 43 MJ 252 (1995) (remand ordered to consider exclusion of defense evidence in pre-*Daubert* court-martial).

S.Ct. 946, 130 L.Ed.2d 890 (1995); *United States v. Bonds*, 12 F.3d 540 (6th Cir.1993); *Spencer v. Murray*, 5 F.3d 758 (4th Cir.1993) (collateral attack), *cert. denied,* —— U.S. ——, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994); *United States v. Martinez*, 3 F.3d 1191 (8th Cir.1993), *cert denied,* —— U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994). Moreover, at least two circuits now approve taking "judicial notice of the general acceptability of the general theory" of DNA analysis. *United States v. Martinez*, 3 F.3d at 1197; *United States v. Jakobetz*, 955 F.2d 786, 799 (2d Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Finally, most state courts permit such evidence to be admitted if a proper foundation is established.[7] We agree with the reasoning of the above courts and conclude that evidence of DNA testing is admissible at courts-martial if a proper foundation is laid.[8]

■ 22. The next question we must decide is whether *Daubert* mandates an inflexible four-factor test for establishing that foundation. This question is answered adversely to appellant in *Daubert* itself. There, the Supreme Court stated:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a

preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

509 U.S. at 592–93, 113 S.Ct. at 2796 (footnotes omitted). Thus, *Daubert,* like this Court's decision in *Gipson,* does not strictly require some evidence of each prong to uphold admission of such evidence on appeal. In *Gipson* this Court similarly stated:

What tools may the judge use in evaluating probativeness and helpfulness? Ironically, one of the most useful tools is that very degree of acceptance in the scientific community we just rejected as the be-all-end-all standard. 753 F.2d at 1238. The point is, general acceptance is a factor that may or may not persuade; it is not the test. Other factors may now be equally persuasive. *Id.* at 1238–39; Weinstein [& M. Berger, *Weinstein's Evidence* ], *supra* at para. 702[03] [ (1985) ].

24 MJ at 252.

■ 23. Turning first to the DNA evidence presented in this case, we note that the foundation for its admission was provided

---

**7.** Similarly the weight of authority in state courts favors admission under either *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), or evidentiary rules which are analogous to Fed.R.Evid. 702. *See generally* 84 ALR 4th § 5 at 341 (1994) & (Supp.1995) (noting while state courts are generally in accord with admission of DNA evidence, some view admission of statistical evidence of likelihood of a match as too prejudicial).

**8.** "The fundamental premise of the DNA paradigm is that all heritable information passed from parents to offspring is contained within a complex molecule called DNA." Thompson and Ford, *DNA Typing: Acceptance and Weight Of The New Genetic Identification Tests* [hereafter DNA Typing], 75 Va. L.Rev. 45, 61 (1989). Although "[m]ost DNA-carrying cells in a human contain the same information," Overview of RFLP Analysis, *Reference Manual on Scientific Evidence* [hereafter *1994 Reference Manual* ] 281 (Fed.Jud.Ctr.1994), DNA analysis is particularly

potent forensic evidence because "[n]o two individuals, except for identical twins, have identical DNA." DNA Typing, *supra* at 61. The areas where DNA molecules differ between individuals are called polymorphisms and "provide the basis for DNA identification." *United States v. Jakobetz,* 955 F.2d 786, 791 (2d Cir.), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). "DNA typing uses advanced techniques developed by molecular biologists to 'home in' on regions of DNA where there are differences among individuals." DNA Typing, *supra* at 63 (footnote omitted). Scientists use one of two methods to compare polymorphic DNA segments. The German laboratory employed in the present case used restriction fragment length polymorphism (RFLP) analysis, a method "used in non-forensic settings for many years" and one that many courts have concluded "can produce reliable information relevant to the identification of a forensic sample of DNA." *1994 Reference Manual, supra* at 277, 285.

by Doctor Reiner Wenzel, a German biologist at the State Crime Laboratory of Rheinland Pfalz, Germany. He was qualified as an expert in forensic DNA testing or genetic fingerprinting without defense objection. He explained DNA, the history of its scientific study, and its use in forensics where there is "biological trace material." He further explained the process of DNA testing and said that it was "generally accepted in the scientific community." He also testified that DNA testing had drawn much interest in publication and had widespread approval. Finally, he testified that this testing could be duplicated and that RFLP testing was reliable and widespread in use, and that quality controls were employed at his laboratory. This is a sufficient basis for us to conclude that the military judge did not abuse his discretion in admitting DNA evidence [9] in appellant's case.[10] *See United States v. Chischilly*, 30 F.3d at 1158; *United States v. Davis*, 40 F.3d at 1073.

24. Turning to the blood-analysis or serology evidence presented in this case, we note that the prosecution proposed to offer this evidence in different forms: First, evidence that blood on appellant's shoes matched the victim's blood type; second, testimony that blood in appellant's car matched the victim's blood type; third, testimony that

any blood stains on appellant's shirt would be cleansed if his shirt was washed. The defense only objected to the chain of custody showing preservation of the blood stains [11] and the suggestion that the washed-shirt testimony was based on science or the scientific method.

25. The Government's expert in blood testing was Doctor Hartmuth Klein, head of the department for examination of biological evidence at the Regional Criminal Office in Mainz, Germany. He testified as to his training and qualifications in blood analysis. He admitted that he had no special training in the examination of clothing for traces of blood. However, he also testified that "there was no specific training" in the "examining of items of clothing for traces of blood," but none was required. He also said that the "principles you apply to the analysis of blood" were "completely identical" to those "applicable to examining items of clothing for traces of blood."

26. We note that the defense failed to object to the blood-analysis evidence in this case with respect to his shoes and car. Thus, any error in admission of such testimony under *Gipson* or *Daubert* was waived. Mil.R.Evid. 103(a)(1). *See United States v.*

9. Appellant at trial argued that "there is a lack of general acceptance of the statistical approach which quantifies the significance of an alleged match." This argument was rejected recently in *United States v. Davis*, 40 F.3d 1069, 1075 (10th Cir.1994), where the court said:

Mr. Reed [a second defendant] also argues that the district court erred by admitting evidence of statistical probability. However, statistical probabilities are basic to DNA analysis and their use has been widely researched and discussed. Mr. Reed and Mr. Davis had ample opportunity to cross-examine experts and make arguments about probability to the jury. We therefore hold that the district court did not abuse its discretion by finding that the statistical evidence was more probative than prejudicial.

*Cf. Taylor v. State*, 889 P.2d 319 (Okl.Cr.1995).

10. Appellant also argues that the statistical probability data base was not shown to be relevant because his genetic heritage was unknown. In *United States v. Bonds*, 12 F.3d at 564, the Sixth

Circuit held this was a matter of weight, not admissibility.

11. It is well settled that "the Government bears the burden of establishing an adequate foundation for admission of evidence against an accused." What the Government must do to meet this burden varies with the type of evidence being presented to the court. For example, blood samples and other "fungible evidence" like that being challenged in the present case also require a " 'showing of continuous custody which preserves the evidence in an unaltered state.' " *Id.* This foundational predicate is met in such cases by "show[ing] that there is a reasonable probability the sample which was tested was in fact from the purported source *and* that it was not altered." *United States v. Maxwell*, 38 MJ 148, 150 (CMA 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994). We conclude that the military judge did not abuse his discretion by finding the Government had met its burden with regard to chain of custody associated with serology, fiber analysis, and shoe-print evidence.

*Johnson*, 35 MJ 17, 18 (CMA 1992); *United States v. Carter*, 26 MJ 428, 430 (CMA 1988). His particular objection to the washed-shirt testimony under Mil.R.Evid. 702 arguably raised a colorable *Daubert* claim. *See United States v. Dorsey*, 45 F.3d at 814–15. However, we need not decide this question today in light of the actual blood-stain evidence properly admitted in this case. In this light, any error by the judge in admitting the absence-of-blood-stain evidence was clearly harmless. Art. 59(a), UCMJ, 10 USC § 859(a).

27. Turning to the evidence of fiber analysis, it was provided by Klaus Berkefeld, a biologist at the State Criminal Office in Mainz, Germany. He was qualified as an expert in fiber analysis without objection by the defense. He testified as to the various methods of fiber comparison and their acceptance in his field. He further testified that certain fibers taken from the victim's body and car matched fibers from appellant's t-shirt. Defense counsel did not object to this witness' testimony on fiber analysis on the basis of Mil.R.Evid. 702 or *United States v. Gipson, supra*, but only on chain-of-custody grounds.[12] Moreover, fiber-analysis evidence has been routinely admitted in criminal cases both in Federal and state criminal courts for many years. *See generally* P. Giannelli and E. Imwinkelried, 2 *Scientific Evidence* (hereafter Giannelli) § 24–5 (2d ed. 1993). In this context, we find no plain error in admission of this evidence at appellant's court-martial. *See United States v. Johnson, supra.*

28. The remaining expert testimony challenged in appellant's final brief is the "bloody footprint" testimony of Joachim Kiefer, who was accepted as an expert in the forensic examination of shoe prints. He testified that in his expert opinion the shoe print on the skin of the victim "match[ed] the right shoe" of appellant and "derive[d] from the same shoe." Appellant objected to a probability question as to the accuracy of this expert opinion on the ground that "[t]here has been no evidence that this is a generally recognized standard."

29. Defense counsel did not object to Mr. Kiefer's qualifications "as an expert in the forensic examination of shoe prints." *See* Mil.R.Evid. 103(a)(1). Moreover, evidence of this type of expertise has been recognized as admissible evidence in Federal Courts of Appeals and in state courts. *McDonnell v. United States*, 455 F.2d 91, 95 (8th Cir.1972); *People v. Campbell*, 146 Ill.2d 363, 166 Ill. Dec. 932, 586 N.E.2d 1261 (1992). *See generally* Gianelli, *supra* § 16–1 at 479 n. 1. Finally, defense counsel's specific objection to this evidence was only to probability testimony from the expert. Trial counsel rephrased his question in terms of the personal certainty of the examiner who then explained in detail the basis and method leading to his conclusion. *See People v. Edelbacher*, 47 Cal.3d 983, 254 Cal.Rptr. 586, 766 P.2d 1, 19–20 (1989); *Thiel v. State*, 762 P.2d 478 (Alaska App.1988). Accordingly, we conclude that the military judge did not commit reversible error in admitting the shoe-print evidence in these circumstances.

The decision of the United States Army Court of Military Review is affirmed.

Judges COX, GIERKE, and WISS concur.

CRAWFORD, Judge (concurring in the result):

30. I think it is important to note the relationship between *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); *United States v. Gipson*, 24 MJ 246 (CMA 1987); and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

31. The holding in *Daubert* was to reject the *Frye* standard that had been applied by the Ninth Circuit. Beyond this holding the Court offered some "general observations." The "overarching" theme is "evidentiary relevance and reliability." 509 U.S. at 593, 594, 595, 113 S.Ct. at 2796, 2797. These two have been the hallmark of our cases. *See United States v. Houser*, 36 MJ 392, 399 (CMA), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993); *United States v. Gipson*, 24 MJ at 251. The factors to employ in

12. *See* n. 11, *supra.*

determining the reliability approach all existed prior to *Daubert.*

32. I agree with the majority that *"Gipson* references *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985), a case which delineates foundational considerations similar to those noted in *Daubert,"* and thus I similarly "reject appellant's initial argument in this case and conclude that the military judge's rulings need not be found erroneous simply because they pre-dated *Daubert."* ¶ 18.