UNITED STATES, Appellee

v.

Edward A. ST. JEAN, First Lieutenant
U.S. Air Force, Appellant.

No. 95–0756.
Crim.App. No. 29942.

U.S. Court of Appeals for
the Armed Forces.

Argued March 25, 1996.

Decided Dec. 11, 1996.

For Appellant: *Captain Marge A. Overly* (argued); *Colonel Jay L. Cohen* (on brief); *Major Ormond R. Fodrea.*

For Appellee: *Colonel Jeffery T. Infelise* (argued); *Lieutenant Colonel Michael J. Breslin* and *Captain Libby A. Brown.*

## Opinion of the Court

COX, Chief Judge:

A general court-martial (referred non-capital) comprised of members at Wright–Patterson Air Force Base, Ohio, convicted appellant, contrary to his pleas, of the premeditated murder of his wife, in violation of Article 118(1), Uniform Code of Military Justice, 10 USC § 918(1). He was sentenced to dismissal, confinement for life, and total forfeitures. The convening authority approved the sentence, and the Court of Criminal Appeals affirmed in an unpublished opinion.

We granted review of these issues raised by appellant:

### I

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING, OVER DEFENSE OBJECTION, DR. GRANT, A FORENSIC PSYCHOLOGIST, TO TESTIFY ABOUT SUICIDE PROFILES AND THAT HIS "PSYCHOLOGICAL AUTOPSY" REVEALED IT WAS UNLIKELY THE DECEASED COMMITTED SUICIDE.

### II

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION FOR APPROPRIATE RELIEF TO PREVENT THE GOVERNMENT'S FIREARMS AND TOOL MARK EXAMINER'S TESTIMONY CONCERNING THE EXPERIMENT HE CONDUCTED ON LATEX–COATED STYROFOAM HEADS FOR GUNPOWDER PATTERN DETERMINATIONS TO ESTIMATE THE LOCATION OF THE DECEASED'S HEAD IN RELATION TO THE DOOR WHEN SUCH EXPERIMENT LACKED ANY SCIENTIFIC BASIS, DID NOT REASONABLY APPROXIMATE THE TRUE CONDITIONS OF THE ALLEGED CRIME SCENE, AND WAS BASED ON A NOVEL SCIENTIFIC THEORY THAT GUNPOWDER BOUNCED FROM THE DECEASED'S HEAD ONTO THE DOOR.

### General Facts

On the morning of Monday, April 15, 1991, at approximately 10:40 a.m., appellant called 911 from his home to report that his wife, Trish ("Trish"), had committed suicide. Appellant had arrived home for lunch shortly before his call, leaving work approximately 15 minutes earlier than usual. When the first wave of police and emergency officials from the City of Huber Heights and Montgomery County, Ohio, began arriving a few minutes after appellant's call, they found the deceased on the bathroom floor in a pool of blood. A handgun, which was subsequently determined to have inflicted the fatal wound, was lying on the sink nearby. The first police officer who entered the bathroom and felt Trish's wrist testified that "[i]t was cold and clammy at that time and there was no pulse." A medic arriving shortly thereafter confirmed that she was dead.

The officer-in-charge at the scene testified concerning appellant's appearance as follows:

His demeanor was very nervous. He didn't seem to be too upset, just more nervous than anything else at the time of our arrival.

When appellant was informed that an atomic absorption test would be performed on him at that time to determine if he had recently fired a weapon, the officer-in-charge noticed that appellant

became a little more nervous and he began wrenching his hands in this manner as if to wipe them off . . . . and also he wiped them on his pants a couple of times. He also had a can of pop that had a little big [sic] of dew on it. He was seen taking hands and running them up the side of the pop on both sides and then setting the pop can down and then again attempting to wipe his hands clean with the water from the dew on the can.

At the scene, according to one of the officers, appellant recounted the events of the morning. He explained that, on his way to work that morning at about 6:30 a.m., he realized he had the car seat with him and that he would have to bring it home again so that Trish could take their younger child, L, to the sitter. When he got to work he called Trish, and they continued the argument they had had earlier that morning. He told the police that the handgun was his and that he had bought it 9 or so months earlier with the intention of committing suicide himself.[1]

He also told the police that when he arrived home for lunch, he found the deceased

> laying [sic] in the bathroom with her hand elevated 6 to 7 inches above the gun and that when he walked around her to check her, he picked up the gun with his left hand, put it in his right hand and then placed it ... he picked it up with his left hand, put it in his right hand and placed it on the sink.

The officer who interviewed appellant at the scene noted that he

> made a point of telling me that he handled it with both hands and he made a point of telling me that he handled it with his right hand and he made the motion as if he—he had the trigger finger extended and he's holding the grip and he said he laid it up on the counter in that manner.

On cross-examination, defense counsel challenged the officer's ability to know

> when he's [appellant] trying to make a point of something and when he's not trying to make a point of something,

since the officer did not know appellant. The officer responded:

> It happened on three or four occasions and it was definite and obvious to me, in my interviewing skills, that he was making a point of what he was trying to tell me.

After removing the body and completing the rest of their investigation on site, the officers returned to the police station. Appellant agreed to accompany them. After being advised of and waiving his rights and agreeing to talk to the officers without the presence of an attorney, he gave a much fuller, tape-recorded account [the first tape-recorded interview] of the events leading up to his discovery of the deceased.

Therein, appellant again described the ongoing argument he was having with Trish that morning (about whether she would continue college). He indicated that he had left work that morning at about 8:00 a.m. to bring the car seat home. The argument continued at home and "Trish was still very edgy and agitated." According to appellant, he dropped off A (the older child) at her bus stop. Then he returned to the house where he picked up L and drove her to the sitter. From the sitter's he returned directly to work.

Shortly after arriving back at work appellant called Trish, at about 9:10 a.m. According to him, she was still in bed, and he "said—Go to school and she slammed the phone down on" him. When he called back, she would not answer. Arriving home for lunch, he found her dead.

A co-worker of appellant, testifying subsequently at appellant's court-martial, corroborated his comings and goings that morning at work, and was cognizant of appellant's making a 3 to 5 minute telephone call to his wife that morning shortly after 9:00 a.m.

In the first tape-recorded statement, appellant also told the officers that he had bought the pistol from an individual and had given him a false name. Appellant never registered it. He further explained that his wife hated guns—she was "anti-gun"—and that he doubted she had ever fired one.

> The officers then asked appellant:
> When the test results come back on your hands, are we going to find anything that you had fired that weapon at all?
> Appellant replied:
> Other than having picked up the gun, you shouldn't, no. Would that show?

Appellant was specifically asked (which he **denied) whether there was any "possibility that there could have been a struggle in**

---

1. Appellant had apparently attempted to commit suicide by carbon monoxide poisoning in September 1990. He was not able to bring himself to try to kill himself with the pistol.

the bedroom with her with the gun in her hand and the two of you wrestling around and she accidentally got shot." (Emphasis added.) At the conclusion of the first recorded interview, the officers transported appellant back to his residence; then they returned to the station to review the situation.

Ultimately, the officers decided that another interview of appellant was going to be necessary. Therefore, that same day, April 15, 1991, at about 3:40 p.m., the officers returned to appellant's residence and asked him if he would return to the station. Appellant agreed. At the station, his rights were reviewed and he again agreed to talk to the officers on tape and without the presence of an attorney.

In this second recorded interview (both recorded interviews were played for the court members and are transcribed verbatim in the record of trial), appellant reiterated the morning events, including the initial argument, his departure for work and discovery of the car seat, his return home and disposition of the children, his return to work and his phone call home, his early return home for lunch and the discovery of his wife's body, and his handling of the weapon.

Appellant also amplified his account of his purchase of the weapon 9 months earlier, how he had test fired it a week or so after purchasing it, but he claimed that he had not fired it since. He went on to describe how he hid the gun

> in a breast pocket of a coat in our coat closet in the living room, which is where Trish found it when she was sorting through coats for "Coats for Kids." Ahh— we had a fight, then a reconciliation after the fight and I told, you know, I had told her what I bought it for and what I was thinking of when I bought it. And, you know, she was all over me. It wasn't a pretty sight. She was real mad. She had made herself pretty clear before that point, you know, how she felt about guns and stuff around the house and around the kids. You know, she just—guns only serve one purpose and where we live, you know, there's never a need for that kind of thing. So I had kept it hidden. At that point, she

> kept it and told me that she had thrown it away. **That was the last I had seen of it up until this point.**

(Emphasis added.)

Appellant, however, had been lying all along, as shortly became dramatically clear. The police could not know, on April 15, still just a few hours after the discovery of Trish's body, that an analysis several days later of the swabs taken of appellant's and Trish's hands would, in the opinion of the forensic chemist, be "consistent with" appellant having recently fired a weapon but with Trish having not.

Thus, after asking appellant about the amounts of life insurance in force with respect to Trish and himself (*see infra*) and about his post-service plans (appellant was in the process of separating from the service, and he intended to open a business), one of the investigators asked appellant:

Q. How about the tests on your hands about firing the weapon?

A. Ahh—did I pass or fail?

Q. Well, that's why we're—

A. I hoped I passed, but like I said—I picked up the gun. Is that enough to trigger?

Q. Well, that's what we need to talk about.

A. Okay.

Q. We need to know if you fired the weapon. It would behoove you to let us know that now.

A. Right.

Q. So we can get the whole thing taken care of.

Obviously believing that the police knew something they could not possibly have known at the time, and thinking that his bluff had been called, appellant suffered the equivalent of an open mike melt-down. Thus, he responded:

A. Okay. At—at—this point—I—and you've been through this with me before— there are several statements that I need to change, okay? Umm—first, let's try once again. First—I don't know where to start. **Yes, I fired the gun today. I have had the gun for about the past week.** Trish

gave it to me last week—remember, when she threw up the suicide things.[2] She says—Here, have this back. Umm—and it still, at that time, like I say, maintained four rounds. We got in a fight—**the reasons that I've tried to set it up this way was really more than anything to protect her** [!!!]—or try to make this—(Sigh)—we were fighting this morning before I left for work. And I had the gun with me. And that comment last week about—I would never try that kind of a thing. I value life too much and stuff like that. She might have brought that up again this morning. **I ended up, as I went to work, firing off three rounds.** When I came back to pick up the kids, after I took ... [A] to the bus stop and was picking up ... [L], **I gave her the gun. I said— There's one round left. I told her I was tired of the—the torture—what she's been putting me through the past couple of weeks with school and everything. I said—Look, you're the one that's been bragging about this all this time. And I told her that I wanted her to leave and I said—Hey, if you can't leave, here's the gun to—I left her with it. I didn't think she'd use it.** (Long Pause)

**The first time I tried to call her from work, she never answered the phone after the first time I left. She would not answer** and I panicked. I realized what she might have done. **And at that point I sort of made up a conversation on the telephone to make it look like I was talking to somebody.** She wouldn't talk—she wouldn't pick up the phone. And I was terrified. I didn't think she'd actually kill herself. I didn't—I thought she was just playing with me. I really did. The last thing—the last thing she said to me when she left—when I left with ... [L]—**she told me that she hated me. She told me that she hated everything that had happened to her life since I'd come into it and that she was going to— probably leave me.** But when she said— When she said—Well, if I don't, I hope you get stuck with this. I just went off with

... [L]—went to the baby-sitter **and I just couldn't—I just tried to shut it out of my mind. I could not believe what she was doing to me. I couldn't. I just didn't want to accept it. I'm so scared.**

(Emphasis added.)

Also attending that interview at the Huber Heights Police Department was Special Agent Collins of the Air Force Office of Special Investigations. Collins had investigated appellant's own, earlier suicide attempt. *See* n. 1, *supra.* Shortly after appellant's melt-down, Collins got appellant to clarify the nature of the dispute:

Q. I know that what was going on in your head—here's your wife who's been like the cornerstone of your life. I mean she stood behind you when you got into trouble last fall?

A. Yes.

Q. She was somebody you could lean on?

A. Yes. ·

Q. She went to counseling with you?

A. Yes.

Q. She took you to the hospital— A. Yes.

Q. —when you tried to kill yourself before?

A. Correct.

Q. And now for you to go home and find out that Trish is just gonna, you know, wash her hands of it and get out of your life—

A. **I was very angry.**

(Emphasis added.)

Not surprisingly, the investigators indicated disbelief that this woman, who so loved her daughters, would abandon them forever without so much as saying goodbye or leaving a note. Indeed, the officers suggested that appellant's anger at her intending to leave him and take the children might have caused "[t]hings [to] happen," to "get out of hand real quick." When the officers asserted that the facts and circumstances did not seem to support appellant's account of Trish

---

2. Apparently, on at least one occasion, when appellant condemned Trish for wanting to leave him, she reminded him how he had tried to evade his problems by attempting suicide.

killing herself, appellant terminated the interview, though without requesting counsel.[3]

But appellant did not stop talking—or changing his story. The next day, April 16, 1991, appellant, who had been voluntarily hospitalized on a suicide watch, sought out a nurse who was seated outside his room, inquiring, "[M]ay I please talk to you?" The nurse testified that she thereupon entered his room to see how he was feeling. He wanted to know, however, if she had heard whether the "powder tests had come back yet," referring to the "powder tests on his hands." When the nurse replied that she had no idea, he continued to ventilate, stating that "he knew that he would have powder on his hands and she'd [Trish] have scant to none on hers." He told the nurse of their fighting and his giving the gun to Trish.

Then, according to the nurse,

within a real brief period of time, he became angry as he said she said—the last thing she said to me—

(The court reporter interrupted the proceedings due to mechanical difficulties.)

—the last thing she said to me was, well, if I do do it, I'll make sure that you pay for it. And I said, how can that be. And he said she had probably wrapped a towel around her hand when she shot herself so it would get pinned on me.

(Emphasis added.)

No such towel was found at the scene, and appellant had never mentioned removing one. There was also no explanation how Trish, who so abhorred weapons, would have the knowledge or presence of mind to use a towel to preclude a subsequent positive finding on an atomic absorption test.

That same day, April 16, 1991, appellant was visited in the hospital by Special Agent Collins. After being advised of his rights, waiving them, and agreeing to talk to Collins without the presence of counsel, appellant reiterated much of his account of the events as modified up to that point. Regarding the faked phone call, according to Collins:

He talked about the 9:05 telephone call back to his wife. **He indicated that he had staged this phone call so that he wouldn't be implicated in the killing.** I thought that that was significant because that was the first time that he had mentioned the word "killing." He felt that he needed to make this phone call so it would be overheard by co-workers so that he would not be implicated in her death.

(Emphasis added.)

Appellant was released from the hospital on April 17 and granted a short leave by his vice-commander. At the same time, the vice-commander restricted appellant to the vicinity of Wright–Patterson Air Force Base, as bounded by certain specified interstate highways. Contrary to these orders, however, appellant rented an automobile and drove to Buffalo, New York, near the Canadian border, where he registered in a motel. The car was returned to the rental company in Dayton, Ohio, on April 24.

On that day, appellant was apprehended at the hospital at Wright–Patterson Air Force Base by Special Agent Collins for premeditated murder. Appellant's own vehicle was found in the hospital parking lot and, in the presence of appellant's father, it was inventoried. In the glove box was discovered approximately $14,000 in cash. Based upon federal search warrants executed on various banks and other financial institutions and on information provided by appellant's father, it was determined that the cash was generated by a series of credit card advances and bank withdrawals made by appellant.

Appellant's father testified and verified the foregoing. He also recounted how he and appellant's mother were permitted to visit their son in the confinement facility on Sunday, May 5, 1991. Appellant told his parents on that occasion

---

**3.** During the second tape-recorded interview, appellant also described with some particularity the location on Wright–Patterson Air Force Base where he allegedly fired the weapon that morning. A prompt search that day (by eight agents and three ordnance officials using metal detectors) of the stretch of road appellant had indicated revealed no spent cartridges. A subsequent search of appellant's car was similarly unproductive.

that he had talked to God on this and he was going to tell it as it happened that the situation to him was **that his wife had caught him in the process of attempting to take his own life and they struggled and the gun had gone off and struck her.**

(Emphasis added.)

Given appellant's astonishing and blatant succession of fabrications, the balance of the Government's case may be somewhat briefly indicated. L's baby-sitter described her surprise to find appellant delivering L, something he had not done in at least 4 months. Moreover, L was not expected for at least another 2 hours.

The pathologist who conducted the autopsy concluded that Trish died as a result of a gunshot wound to the head. He was "certain that it's homicide." His conclusions appear to be derived to a large degree from the unusual angle of trajectory of the fatal bullet, which he demonstrated in court by touching his right index finger to his right temple, with his elbow back and above his head, and with the finger pointed in a downward direction toward his mouth.

Some 4 months before Trish's death, appellant increased her life insurance coverage, as to which he was beneficiary, from $135,000 to $180,000. His own coverage stood at $150,000. Appellant well knew that a finding that Trish had committed suicide would not bar his recovery of the insurance proceeds.[4]

Needless to say, the prosecution drew a vastly different set of conclusions from the evidence than did appellant. In the Government's view, appellant was enraged that Trish intended to leave him and take the children, and they had argued bitterly. He concocted his pretext for returning home with the car seat, and he delivered L to the

sitter early to have her out of the way. He then retraced his route home, which was only a few minutes from the sitter's house in any event. Entering his house with the weapon which he had retained, he surprised Trish in the bathroom and murdered her with a single shot. He then placed the weapon on the sink, fully realizing he would have to account for his finger prints on it. Returning quickly to base, he staged the fake phone call to solidify his alibi. The bogus "won't-go-to-class" argument was an attempt to cover the true motive.

All of the evidence heretofore indicated was before the factfinder, and its admissibility stands unchallenged before this court.[5] By comparison, the two issues raised here by appellant scarcely amount to a blip on the evidentiary radar screen.

### The "Psychological Autopsy"

As he did at trial, appellant objects to the testimony of Dr. William H. Grant. At the outset, several addenda need to be made to the issue as raised before us. One: Dr. Grant is a psychiatrist, not a psychologist— or at least he has consistently so represented himself over the years, and no contrary evidence appears. Two: Dr. Grant performed what he termed a "retrospective, after-the-fact assessment of an individual's mental state at the time of death." While some people refer to this by the pop term "psychological autopsy," that was not a term that had meaning to Dr. Grant. Three: At trial, Dr. Grant never "testif[ied] ... that ... it was unlikely the deceased committed suicide." These matters apart, we conclude that the granted issue is without merit.

Dr. Grant is a board-certified forensic psychiatrist who, at the time of trial, had retired from the Air Force after 22 years of service

---

4. Special Agent Collins, having investigated appellant's own prior suicide attempt, produced the suicide note appellant left for Trish at that time. The note featured a specific explanation that the family policy did not bar recovery for a suicide unless the insurance company could prove that suicide was intended at the time of application for the policy. For Trish's benefit, appellant highlighted, in the policy, the specific language in question.

5. As legal sufficiency of the evidence is not before us, we make no attempt to summarize all of the evidence for the parties. That issue was litigated and resolved against appellant at the much higher factual threshold in the Court of Criminal Appeals. We are cognizant, of course, that the defense in the instant case mounted an extensive effort, based largely on the opinion of a variety of experts, to suggest that the physical evidence was not inconsistent with suicide.

and was in private practice in Alabama. While still on active duty, he was tasked with assessing the state of mind of the deceased at the time of her death, insofar as possible. Since the moment of appellant's 911 call, that matter was very much "in issue."

Prior to testifying at the Article 32, UCMJ, 10 USC § 832, investigation, Dr. Grant had reviewed approximately 41 documents relating to the case, including police reports and interviews, autopsy reports, medical records, and numerous statements from family members, friends, and acquaintances of the deceased, including relatives of appellant. In the course of his study of Trish, Dr. Grant prepared an impressive report, cataloging the evidence and data, the methodology of his evaluation, and the bases of his conclusions. Ultimately, Dr. Grant was unable to detect any indication that Trish was suicidal at the time of her death, and, indeed, he testified at the Article 32 investigation that he personally concluded she had not committed suicide.

At the court-martial, the defense moved to suppress Dr. Grant's testimony on a wide variety of grounds, *arguing* that it would amount to an opinion on the ultimate issue in the case (*i.e.*, that appellant murdered Trish); that it would amount to a comment on appellant's credibility; that Dr. Grant's report noted appellant's history of prevarication and that his evaluation was therefore subjective (*i.e.*, non-scientific) and, moreover, relied on hearsay evidence; that he had set himself up as a "one-man lie detector"; that what Dr. Grant had set out to evaluate was "such subjective and soft science if it is a science at all" that it amounted to "nothing more than a flip of the coin" and was not helpful information for the factfinder [Mil.R.Evid. 702, Manual for Courts-Martial, United States (1995 ed.)]; and its prejudicial impact outweighed any probative value (Mil.R.Evid.403).

No *evidence*, however, opinion or otherwise, was presented by the defense to attack the scientific basis of Dr. Grant's analysis or opinions. For evidence, the Government relied on the transcript of Dr. Grant's Article 32 testimony, on his report, and on an ex-

cerpt from a learned treatise regarding criteria of suicide risk.

After considering the arguments and briefs of counsel and the documentation submitted, the military judge allowed the testimony of Dr. Grant under Mil.R.Evid. 401–03 and 702. However, the military judge greatly narrowed the permissible scope of Dr. Grant's testimony in these respects: First, he would

**not permit Dr. Grant to testify, therefore, it is his opinion that Mrs. St. Jean did not commit—or in his opinion it is not likely that Mrs. St. Jean committed suicide.** That testimony is limited testimony to the testimony of the profile of one who is, psychiatrically speaking, suicidal or a suicidal risk and then the testimony, if in his opinion, after a proper foundation has been laid, if in his opinion then, Mrs. St. Jean did not exhibit or he found no such profiles with respect to Mrs. St. Jean. It is limited to that area.

(Emphasis added.)

Second, the military judge would not permit Dr. Grant to comment on the credibility or veracity of appellant.

Third, the military judge would not permit trial counsel to ask Dr. Grant about what he saw in the police reports or for trial counsel to "start dragging in evidence before the court that would be inadmissible."

Fourth, the military judge specifically warned counsel "in their adversarial zeal" not to try to expand the testimony beyond the rigid limitations announced.

Within these limitations, however, the military judge found

that the testimony would be relevant. It's testimony that might assist the members of the court. Its prejudicial impact—I have conducted the balancing test and I find that prejudicial impact would not outweigh its probative value. So, accordingly, the Court will permit the testimony of Dr. Grant within the parameters established.

██ When called as a witness by the prosecution, Dr. Grant explained that, within the obvious limitations, he was trying to assess retrospectively the state of mind of the deceased. He explained his methodology and

the general nature of the materials he drew from. He discussed the volumes of studies conducted to try to understand the causes of suicide and the means to prevent it.

Asked by trial counsel about "generally accepted indicators, characteristics, warning signals for individuals with a high risk of committing suicide," Dr. Grant described "two ways to look at it." According to Dr. Grant:

If you look at it strictly statistically and strictly actuarial [sic], the individual at high risk for suicide is male, over 45, living alone, no job, physically ill, and probably alcoholic.

The other method, was described as follows:

The way we teach the residents and the medical students we neumatic [mnemonic] it. And the ... [mnemonic] for what you should be thinking as you evaluate a suicidal patient in the emergency room is called the "SAD PERSONS" ... [mnemonic]. Each first letter stands for something—if I can remember what they are. "S" is sex. Males are more likely to commit suicide than females. Females are more likely to try or to make gestures. But real intended suicide is far more frequent in males. "A" is age, over 45. "D" is depression. People who are depressed are the—half the people who kill themselves are depressed. Being depressed ups the likelihood of suicide by 30 times over the nondepressed person. "P" is priors. Have they ever done it before? Priors raise the odds something like 64 times if there's a prior. "E" is ethanol. That's the way a doctor talks about alcohol. And it's alcohol and/or substance abuse, drinking or drugs. A person who drinks or who uses drugs is more likely. "R" is rational thought. Have they lost their ability to think clearly? Has it gotten to the point where they can see nothing but their problems, there's no way out? All they see is problems in the future. Have they lost their ability to assess their own situation, what to do about it? "S" is support system. Do they have a support system in place? Is it functioning? Because people

who [commit] suicide are very isolated people; they have nobody to turn to. A very, very common precipitant of suicide is when the last door closes in your face. "N" is no spouse. People who are widowed, divorced, single are more likely to [commit] suicide. And "S" is sick, physically sick. So it's "SAD PERSONS."

Based upon his analysis of the information made available to him, Dr. Grant could not find that Trish possessed any of the foregoing characteristics at or near the time of her death.

Beyond that, Dr. Grant noted:

Really two types of people kill themselves, the depressed person and the highly impulsive person. The highly impulsive person who isn't really depressed, but who is angry is at risk for suicide. But in the impulsive person, what one sees is a history of impulsivity. They see—you see someone whose reactions to stress and reactions to situations and reactions to other people have been impulsive and not always in their best interests over an extended period of time and recognizable from situation to situation. You know, if you were impulsive a year or two years ago and there's a pattern, you're likely to be impulsive now and you're probably going to be impulsive in the future. And impulsive people like this are at times prone to suicide. They tend to alienate people so that they can have the support system—to give them an option other than suicide. And, yes, sometimes they get angry and do something destructive to themselves. But there has to be a pattern.

Recognizing the obvious fact that the statistical factors alone lacked predictive value [e.g., while more males may commit suicide than females, not every male is therefore a suicide candidate], and acknowledging that all responsible studies contain caveats as to reliability, and that he had never had the opportunity to interview the deceased or to have psychological tests conducted on her, and that his evaluation and opinions were perforce based on the statements and reports of others, Dr. Grant was able to detect no evidence that Trish was either depressed or

impulsive. At trial he so testified, but he was not asked to, *and he did not pronounce,* on whether she was "suicidal."

The Court of Criminal Appeals held that the military judge did not abuse his discretion in receiving Dr. Grant's limited testimony. Unpub. op. at 3. We agree.

■■■ Expert testimony is admissible if it is relevant (Mil.R.Evid 401–02), if its probative value outweighs its prejudicial value (Mil.R.Evid.403), and if the testimony will assist the trier of fact (Mil.R.Evid.702). In *United States v. Houser,* 36 MJ 392, 397–98 (CMA 1993), Judge Crawford, speaking for the Court, distilled six factors out of these rules: (A) the qualifications of the expert, (B) the subject matter of the expert testimony, (C) the basis for the expert testimony, (D) the legal relevance of the evidence, (E) the reliability of the evidence, and (F) whether the "probative value" outweighed the other considerations. When a military judge has considered these factors, our standard of review is abuse of discretion. *Id.* at 397 (citations omitted); *United States v. Gipson,* 24 MJ 246, 251 (CMA 1987). Like the court of Criminal Appeals, we detect no abuse of discretion on the part of the military judge.

We note that that there is an enormous difference between asserting that persons who bear certain characteristics are likely to have committed crime, *see United States v. Banks,* 36 MJ 150 (CMA 1992), and asserting that persons who manifest particular characteristics are likely to have a certain mental state or condition. *See United States v. Stark,* 30 MJ 328 (CMA 1990); *see generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).

In our review, it appears that Dr. Grant very frankly conceded the limitations of his examination, *i.e.,* that the deceased could not be interviewed or given psychological tests, and that he was forced to rely on the statements, observations, and reports of others. Such vicarious fact-gathering is expressly permissible and normal in the medical, psychiatric, and psychological fields. Mil. R.Evid. 703; *see* S. Saltzburg, S. Schinasi, D. Schlueter, *Military Rules of Evidence Man-*

*ual,* 738–39 (3d ed. 1991); Imwinkelried, *The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony,* 67 N.C.Law Rev. 1 (1988). In addition, Dr. Grant was extremely precise in describing the limitations of his findings: that he could not detect evidence of the deceased's depression or impulsivity at or near the time of her death. Trial defense counsel, for his part, did an excellent job in cross-examining Dr. Grant and clarifying the limitations of his testimony.

Accordingly, Granted Issue I is without merit.

### *The Latex–Coated Styrofoam Heads*

The final issue, although hotly contested at trial, is, in our opinion, of minimal appellate significance. Physical examination of the bathroom where Trish died revealed gunpowder and lead residue on the lower portion of the bathroom door. Mr. Haemmerele, a firearms and tool mark expert for the Huber Heights Police Department undertook to ascertain how those traces got there. He theorized that it bounced there from the victim's head, and he conducted a series of tests by firing bullets into styrofoam mannequin heads covered with a latex coating and observing whether and how the residue bounced onto adjacent cardboard. His experiments led him to conclude that the victim's head was greater than 3 but less than 12 inches from the door and approximately 30 inches above the floor when the fatal round was discharged.

Defense counsel moved to suppress Haemmerle's prospective testimony on every imaginable ground, and the military judge conducted a hearing on novel technology pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See United States v. Nimmer,* 43 MJ 252 (1995); *United States v. Youngberg,* 43 MJ 379 (1995); *United States v. Gipson, supra.*

Without undertaking to characterize all of the evidence considered by the military judge, we note that he found Haemmerle to be

an impressive expert witness with regard to firearms and ballistics testing. He has done several hundred powder pattern/distance determination tests and has testified repeatedly as an expert in this area in various civilian courts here in the State of Ohio. And he has utilized technology taught at the FBI Laboratory. He also, prior to conducting any of these tests, had the opportunity to look at the entry wound in the head of the deceased, actually physically examining that at the coroner's office before the autopsy and the issued autopsy report in this case.

Balancing the various relevance, helpfulness, and reliability standards for emerging technology, the military judge concluded that Mr. Haemmerle's testimony met the threshold for admissibility, and the Court of Criminal Appeals agreed.

The military judge also permitted the testimony, for the defense, of Professor Herbert L. MacDonell, a Professor of Criminalistics at Corning Community College, part of the State University of New York. Professor MacDonell was also Director of the Laboratory of Forensic Science, an independent consulting laboratory available to both the prosecution, defense, and civil litigants as well.

Professor MacDonell disagreed almost completely with the assumptions, methods, and conclusions of Mr. Haemmerle. As summarized by the Court of Criminal Appeals:

> Professor MacDonell provided excellent testimony on "bouncing" gunpowder. He stated it does not bounce in the conventional sense, but falls away, because most of its energy is dissipated from hitting the primary object. Further, the skin and hair would absorb the vast majority thereof. Thus, if any "bounced," it would lack sufficient energy to adhere. Professor MacDonell opined that latex was much too hard to adequately substitute for human skin and naturally would bounce more residue. He stated he believed Patricia's wound angle was too flat for any residue to bounce therefrom. Consequently, he opined the gunpowder and lead residue on

the door was as a result of transfer: she fell against the door after she was shot. Unpub. op. at 14.

Accordingly, the Court of Criminal Appeals concluded that, even assuming *arguendo* it was error to receive Mr. Haemmerle's testimony, the Court was satisfied, based on Professor MacDonell's testimony, that appellant was not prejudiced. In the Court's view,

> Professor MacDonell convinced the members, as he did us, that using the latex covered mannequin heads, especially without covering them with a wig, did not yield accurate results and, in any event, the gunpowder and lead residue on the bathroom door did not get there as a result of bouncing off Patricia. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

Unpub. op. at 7.

■ This alternate conclusion by the Court of Criminal Appeals does not necessarily condemn the military judge's decision to receive Mr. Haemmerle's testimony. The military judge's role as evidentiary gatekeeper does not require him to admit only evidence that he personally finds correct and persuasive and to exclude that which he finds incorrect or unpersuasive. Rather, the judge's role is to screen all evidence for minimum standards of admissibility and to let the factfinder determine which evidence which is more persuasive. That appears to have occurred here.

■ Our bottom line is the dictates of Article 59(a), UCMJ, 10 USC § 859(a), which limits our ability to hold a finding or sentence incorrect as a matter of law "unless the error materially prejudices the substantial rights of the accused." We do not doubt, as a matter of general relevance to enable the factfinder to better understand the *res gestae* of the situation, that it was appropriate for the military judge to allow the parties to attempt to construct the location of the deceased at the time the fatal shot was fired. Indeed, in some cases, such evidence may well be critical. But in the instant case, it did not matter whether the gunpowder residue bounced to the door, was brushed on the door as the deceased fell, or was deposited

there by direct fire. What mattered was whether it was appellant who shot Trish or whether she did it herself. It made no difference whether she was 6 inches or 6 feet from the door when that occurred, or whether she was standing, seated, or kneeling. How the gunpowder residue got deposited on the door did not help to determine who fired the weapon. Thus, no prejudice could possibly have accrued to appellant by Mr. Haemmerle's testimony regarding the bouncing properties of gunpowder residue.

Accordingly, Granted Issue II is without merit.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Judges SULLIVAN, CRAWFORD, GIERKE, and WILKINS[6] concur.

6. Judge William W. Wilkins, Jr., of the United States Court of Appeals for the Fourth Circuit, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).